**UNITED STATES of America, Plaintiff,**

**v.**

**MEDICO INDUSTRIES, INC.,
Defendant.**

**No. 80 C 6434.**

United States District Court,
N.D. Illinois, E.D.

March 28, 1985.

---

Frank Rapoport, Washington, D.C., for plaintiff.

Glade F. Flake & Associates, Washington, D.C., Arnold H. Craine, Levy & Craine, Chicago, Ill., for defendant.

## MEMORANDUM OPINION AND ORDER

GETZENDANNER, District Judge:

This is a civil action brought by the United States of America for declaratory judgment under 28 U.S.C. § 2201. Specifically, the United States alleges that Edward F. Hill, a former government employee, violated the conflict of interest prohibition contained in 18 U.S.C. § 207 by representing Medico in negotiating a contract on which Medico is currently pressing a claim for equitable adjustments before the Armed Services Board of Contract Appeals (ASBCA). The government therefore seeks to declare the contract void and unenforceable. The facts are undisputed and the matter is currently before the court on the cross-motions of both parties for summary judgment. For the reasons stated below, the court enters judgment for the plaintiff.

### Facts

Hill was a contracting officer for the United States Army Munitions Command (ARMCOM) from 1967 until his resignation in August 1973. On May 31, 1973, Hill was the contracting officer for two government contracts, (Nos. DAAA09–72C–0055 and DAAA09–73–C–0259), awarded to defendant Medico Industries, Inc. for the manufacture and delivery of M49A3 60mm projectiles. Hill was also the contract officer for Contract No. DAAA09–73–C–0115, under which the government agreed to purchase a different quantity of M49A3 60mm projectiles from Airport Machining Corporation. On both of these contracts, Hill was assisted by Mrs. Donna Freels.

When Hill left the government in August 1973, he formed a consulting firm offering consulting services and claims preparation assistance for contractors who deal with the government. Sometime shortly thereafter, Medico and its subcontractor, National Extruded Metal Products Co. (NEMPCO), retained Hill to prepare their requests for Extraordinary Relief in connection with Contract Nos. 0259 and 0055. (Defendant's Response 66 to Plaintiff's First Set of Re-

quests for Admissions). Hill consulted with both Medico and NEMPCO and aided them in preparing requests for relief which were presented to the government in September and October of 1973.

In December 1973, before the deliveries for contract 0259 were completed, Hill assisted Medico in preparing an unsolicited proposal for further production of M49A3 projectiles in response to Invitation for Bid DAAA09–73–B–0149. (Plaintiff's Appendix, p. 7). As explained in the proposal, Medico was concerned by the adverse financial impact of a break in production between Contract 0259 and a new contract, and therefore submitted an unsolicited proposal. Medico was also aware of an urgent government need for 60 mm projectiles due to the Vietnam war effort and shortages caused by repeated defaults on the part of Airport Machining Corporation, which had entered bankruptcy in June 1973. (Defendant's Response 89 to Plaintiff's First Set of Admissions; Hill Deposition p. 122–23). The December 1973 proposal incorporated all terms and conditions of contract 0259 except where expressly revised.

During late December 1973 and January 1974, Hill negotiated the Medico proposal by telephone with Freels, his former subordinate, and with Marv Jothen, the successor contracting officer. (Hill Dep. 124–25). They discussed matters such as quantities, monthly rates, and equipment availability. Hill was the chief spokesman on behalf of Medico in all areas except delivery schedules. (Hill Dep. 125–26). Throughout these negotiations, Hill was careful to avoid all discussion of the existing contract.

On January 23, 1974, the Government terminated for default its contract with Airport Machining Corporation. On January 31, 1974, Medico was awarded a portion of Airport Machining's terminated requirements. As evidenced by the initial proposal and the minutes of a January 29, 1974 ARMCOM Board of Awards meeting, the government considered Medico's request as a new contract proposal. However, due to the time and costs which would be incurred in drafting a new contract, the procurement was executed as a Modification (P0002) to the already existing contract. (Defendant's Exhibit G). The Modification was for 1,815,000 projectiles at a unit price different from that of Contract 0259, with deliveries to begin on June 30, 1974.

Throughout the period of the negotiations over the Modification, Medico was still making deliveries on Contract 0259. The final deliveries under that original contract were made on February 5, 1974.[1]

On June 14, 1974, Hill wrote a letter to the Commanding General of the Army Armament Command explaining Hill's new employment and soliciting the General's opinion regarding possible conflicts of interest in the Medico transactions. The government never responded.

On November 25, 1974, Medico filed with the government a claim, amended February 20, 1975, requesting equitable adjustment for additional costs incurred in the performance of its obligations under the Modification. This claim, which Hill helped prepare, alleged that the government specifications, identical to those contained in Contracts No. 0055 and 0259, were defective, in breach of the government's implied warranty, and commercially impracticable to produce. The claim listed Vertex Consultants, Hill's company, as Medico's representative. On June 10, 1977, the government denied Medico's claim and Medico appealed that denial to the Armed Services Board of Contract Appeals. This suit followed sometime thereafter.

---

1. Medico argues from the deposition of Freels that deliveries under Contract 0259 were completed in December 1973 or early January 1974. (Freels Dep. at 15.) However, Medico previously admitted that the deliveries continued into February 1974, as is confirmed by a Medico telegram sent on January 17, 1974. (Def's Response 102 to First Set of Requests for Admissions; Plaintiff's Appendix at 14.) The court finds that Freels' recollection as to when deliveries were completed does not create a genuine dispute of material fact in light of defendant's previous admission. In any event, the question of exactly when deliveries terminated is not crucial to the court's decision.

### Conflict of Interest Under § 207

The chief question for resolution is whether Hill violated the conflict of interest provisions of 18 U.S.C. § 207 in representing Medico with respect to a Modification P0002. The applicable statutory provision in effect at the time of the events underlying this lawsuit [2] reads as follows:

> Whoever, having been an officer or employee of the executive branch of the United States Government ... after his employment has ceased, knowingly acts as agent or attorney for anyone other than the United States in connection with any judicial or other proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter involving a specific party or parties in which the United States is a party or has a direct and substantial interest and in which he participated personally and substantially as an officer or employee ...
>
> Shall be fined not more than $10,000 or imprisoned for not more than two years, or both....

As indicated by the legislative history, § 207 was aimed at lessening the "unconscionable use of inside information against the Government by a present or former employee" while simultaneously easing some of the deterrents to government service that the predecessor statute imposed. S.Rep. No. 2213, 87th Cong., 2d Sess., *reprinted in* 1962 *U.S.Code Cong. & Ad. News* 3852, 3854. Specifically, Congress eased the ban on former public employees appearing before the government in connection with matters unrelated to the employee's particular area but expanded the range of activities otherwise subject to the prohibition. In addition, Congress created a lifetime ban on former government employees representing private interests against the government with respect to matters in which the employees had directly participated while in public service.

2. Section 207 was amended as part of the Ethics in Government Act, Pub.L. No. 95–521, 92 Stat. 1824 (Oct. 26, 1978), to restrict further the activities in which a former government official could become involved after leaving federal service.

The parties do not dispute that the effect of a § 207 violation is to render any contract tainted with such conflict unenforceable. *Kearney & Trecker Corp. v. Giddings & Lewis*, 452 F.2d 579 (7th Cir. 1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). Medico has argued, however, that the statute is inapplicable because Modification P0002 was in substance and effect a separate and distinct procurement from Contract 0259. This court has already determined that a violation of § 207 may not be predicated on the technicality that the Modification is part of the Contract, but depends on the materiality of the original contract provisions incorporated by reference in the Modification. *United States v. Medico Industries, Inc.*, No. 80 C 6434 (N.D.Ill. January 4, 1984). In other words, the question is whether the Contract and Modification are sufficiently similar that Hill's participation in both on opposite sides of the fence presents the sort of danger § 207 was meant to address.

As explained in this court's January 4, 1984 opinion, the differences between the Modification and the Contract are in many ways substantial. The Modification was in effect a new agreement to purchase a substantial additional quantity of projectiles at a different unit price. Only due to the exigencies of time and money did the parties forego the execution of a new contract. On the other hand, the Contract and Modification both concern identical products, plans, specifications, and Government-furnished equipment. These production related matters—not the quantity, price, or delivery terms—form the subject of Medico's claim for equitable adjustment. The government therefore argues that even if the Modification is a separate contract for § 207 purposes, it nonetheless involves the same "particular matter" as the Contract, and that Hill's involvement in both therefore violates the statute.

The case law under § 207 is unclear on the precise construction to be afforded the words "particular matter." Medico argues that § 207 is a penal statute and therefore must be narrowly construed. The government, on the other hand, argues that "even penal statutes should be 'given their fair meaning in accord with the evident intent of Congress.'" *United States v. Mississippi Valley Co.*, 364 U.S. 520, 552, 81 S.Ct. 294, 310, 5 L.Ed.2d 268 (1938), *quoting United States v. Raynor*, 302 U.S. 540, 552, 58 S.Ct. 353, 359, 82 L.Ed. 413 (1938) (discussing 18 U.S.C. § 284, and predecessor conflict-of-interest provision). That intent, as discussed earlier, was to prevent the public employee "from 'switching sides' to the detriment of his Government-employer." H.R.Rep. No. 748, 87th Cong., 2d Sess. at 11. Given that § 207 was enacted to broaden the range of proceedings to which the conflict-of-interest provision applies, the term "particular matter" may well have been intended as a catch-all phrase to cover the situation where a former government employee uses inside government information for private gain in breach of the public trust and principles of free competition.

As it did in its earlier motion for summary judgment, the government continues to rely on *Kearney & Trecker Corp v. Giddings & Lewis, Inc.*, 452 F.2d 579 (7th Cir.1971), *cert. denied*, 405 U.S. 1066, 92 S.Ct. 1500, 31 L.Ed.2d 796 (1972). In that case, the Court of Appeals examined the legality of a former patent examiner's involvement in preparing reissue applications of a patent the original issue of which he had handled while still with the Government. The Court began by noting that the legal nature of a patent reissue requires that the reissue contain no new matter, and therefore concluded that the examiner's participation in the reissue application involved the same conflict of interest "as if he had transferred his allegiance while the original application was still pending." *Id.* at 594.

The Court in *Kearney & Trecker* may have been particularly concerned with the factual relationship between the original patent application and the reissue. The patent reissue involved an analysis of the relationship between the plaintiff's patent and a prior patent distinguished in the original file wrapper. The patent examiner, who went to work for the plaintiff almost immediately after leaving government service, concluded that the plaintiff's invention involved a much broader concept than was described in the allowed claims, helped draft plaintiff's reissue application to broaden those claims, and discussed the matters with his former subordinate. The Court found the patent examiner's conduct indefensible.

A case coming out the opposite way is *CACI, Inc.-Federal v. United States*, 719 F.2d 1567 (Fed.Cir.1983). In that case, a former member of the Antitrust Division's Bid Evaluation Committee represented Sterling Systems, Inc., in a subsequent competitive bidding process for automated data processing and litigation support services. The Court found that although the employee had worked on prior data processing contracts while in government service, those prior contracts did not involve the same "particular matter" as the new contract. However, in that case the new proposal did not involve the same parties, was much broader in scope, and was found to be fundamentally different in concept than the prior service contracts. *Id.* at 1576. Although the Court did not discuss the standard in depth, it may be inferred that the Court found these discrepancies necessary to its conclusion that § 207 had not been violated. There was also apparently a greater lapse of time between the employee's government service and his appearance in a private capacity than exists here.

The present case involves a greater danger of abusing the public trust than does *CACI, Inc.-Federal.* As an Army contract officer, Hill was responsible for all government purchases of 60mm M49A3 projectiles. Hill participated in the negotiating of not only Medico's prior contracts but also the Airport Machining Corporation contract whose default led to Modification

P0002. Finally, Hill represented the government in several meetings that addressed NEMPCO's problems in complying with the specifications on Contract Nos. 0055 and 0259, including a high scrap rate and difficulties with the Government-furnished equipment.

These problems were among the claims raised in Medico's request for equitable adjustment. Medico's November 25, 1974 letter, which Hill helped prepare, alleges that the Government withheld technical problems from Medico at the pre-award survey prior to the award of initial contract 0055. Medico's ASBCA complaint further asserts that the Government knew Contract 0259 would be commercially impracticable to perform at the time it was awarded. Although there is no evidence that Medico based these claims on information acquired from Hill, Hill's inside position as an official contract officer on contracts which he now attacks as inequitable presents exactly the sort of impropriety § 207 was intended to address.

■ That Hill may have acted improperly in pressing Medico's claim for adjustment does not necessarily dictate a conclusion that his negotiation of Modification P0002 also violated the statute. In its earlier opinion denying summary judgment, this court assumed, by virtue of the government's failure to rebut Medico's version of the facts, that the contract provisions incorporated in the Modification were merely boilerplate. Insofar as the specifications were developed by officers other than Hill and were not within his particular area of expertise, Hill's violation may be less egregious than the government suggests in its brief. Nonetheless, unlike the new proposal in *CACI, Inc.-Federal,* the procurement under Modification P0002 was not fundamentally different in scope or character than the earlier procurements which Hill was responsible for negotiating, and the incorporated provisions from the earlier contract were material to what subsequently happened.

Hill's inside knowledge of Airport Machining's difficulties and of NEMPCO's problems with specifications present further reasons that he should not have turned around and switched sides by negotiating new contracts on Medico's and NEMPCO's behalf. Finally, Hill's negotiating these contracts with his former subordinate, as occurred in *Kearney & Trecker,* presents a further danger of undue influence which Congress also sought to avoid through enactment of § 207. Considering the entire factual context, the court finds that Hill violated § 207 just as if he had switched sides in the original contract, and that the Modification is therefore unenforceable.

### Estoppel and Unclean Hands

Having determined that the contract is unenforceable, the court must determine the merits of Medico's estoppel and unclean hands defenses. Medico bases these defenses on the inequity which would result from allowing the government to void a contract which it entered into knowing of potential conflicts. Medico further complains that ARMCOM's failure to respond to Hill's request for advice regarding the potential conflict of interest defeats the government's claim. Both arguments, however, are unavailable as a matter of law.

■ The question as to when equitable estoppel is available against the government has received less than comprehensive treatment from the Supreme Court. *See Schweiker v. Hansen,* 450 U.S. 785, 791–92, 101 S.Ct. 1468, 1472–73, 67 L.Ed.2d 685 (1981) (Marshall, J., dissenting). Nonetheless, the general tenor of the Supreme Court opinions in this area is that estoppel shall not apply against the government where the public fisc is threatened and the government is charged with less than affirmative misconduct. *Id.* at 788–89, 101 S.Ct. at 1470–71 (per curiam opinion).

■ In *United States v. Mississippi Valley Co.,* 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), the Court addressed this issue in the context of a similar conflict-of-interest provision regarding public

employees and concluded that estoppel could not apply:

> In any event, the knowledge of Wenzell's superiors and their approval of his activities do not suffice to exempt Wenzell from the coverage of the statute. Neither Section 434 nor any other statute empowered his superiors to exempt him from the statute, and we are convinced that it would be contrary to the purpose of the statute for this Court to bestow such a power upon those whom Congress has not seen fit to so authorize. Congress undoubtedly had a very specific reason for not conferring such a power upon high-level administrators. It recognized that an agent's superiors may not appreciate the nature of an agent's conflict, or that the superiors might, in fact, share the agent's conflict of interest. The prohibition was therefore designed to protect the United States, as a Government, from the mistakes, as well as the connivance, of its own officers and agents.

*Id.* at 561, 81 S.Ct. at 315. Given this general rule, and Medico's failure to point to any misconduct on the Government's part other than silent acquiescence in Hill's violation of § 207, the court finds Medico's defenses legally unavailable to defeat the government's claim that the contract is unenforceable.

### Conclusion

The defendant's motion for summary judgment is denied, and the cross-motion of the plaintiff for summary judgment is granted.

It is so ordered.