**UNITED STATES of America,
Plaintiff-Appellee—Cross-Appellant,**

**v.**

**Jack GRIFFIN, et al., Defendants.**

**Appeal of Merrill MOORES,
Cross-Appellee.**

**Nos. 85–2208, 85–2244.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 6, 1986.

Decided Jan. 31, 1986.

---

Merrill Moores, Moores, Boring & Landwerlen, Indianapolis, Ind., for appellant.

Gerald A. Coraz, Asst. U.S. Atty., Indianapolis, Ind., for plaintiff-appellee cross-appellant.

Before CUDAHY, FLAUM, and EASTERBROOK, Circuit Judges.

EASTERBROOK, Circuit Judge.

The foreclosure of a mortgage has produced a difficult problem in the interpretation of Fed.R.Civ.P. 60(a): whether an error in entering the rate of post-judgment interest into a consent decree is a "clerical mistake" that may be corrected at any time. The blunder in this decree went unnoticed for 20 months, until after the judgment had been assigned to a third party and the property had been sold at auction. Unless this is the sort of mistake that may be corrected "at any time" under Rule 60(a), it cannot be corrected at all.

## I

Carmel Bank had a note for $28,000 plus $9,292 in interest arrears secured by a first mortgage on some property, and the United States had a note for $115,000 plus $15,359 interest arrears secured by a second mortgage. The annual rates of interest were 18% on Carmel Bank's note and 10% on the government's. The United States sought to foreclose its mortgage, and the affected parties worked out a consent decree. The owner admitted the debts and nonpayment; the United States admitted Carmel Bank's prior interest; everyone agreed to the sale of the property to satisfy the debts, the sale to take place free of any equity of redemption. The buyer would get good title, and the United States would have a judgment against the owner for any deficiency.

It was necessary to identify the rate of interest that would apply to the debt between the date the judgment was entered and the date of the foreclosure sale (and the date the United States collected any deficiency). Under 28 U.S.C. § 1961(a) interest "shall be allowed" on every judg-

ment in a civil case, and this interest "shall be calculated ... at a rate equal to the coupon issue yield equivalent (as determined by the Secretary of the Treasury) of the average accepted auction price for the last auction of fifty-two week United States treasury bills settled immediately prior to the date of the judgment." The statute eliminates all discretion. On the date of judgment, someone must find the "coupon issue yield equivalent" interest rate of 52-week treasury bills at the most recent auction. These rates are compiled by the Secretary of the Treasury and published; they are also widely available in the financial press.

The statute creates a potential problem for people negotiating a consent decree. Unless the negotiations conclude with startling dispatch, at least one auction of treasury bills will intervene between the beginning of the negotiations and the entry of the judgment. One expedient is to leave blanks in the decree to be filled in on the day of judgment. That happened here. The decree called for the fund generated by the sale to be disbursed as follows (after provisions for taxes and costs):

b. To the payment of $37,291.89 to Carmel Bank and Trust Company, with future interest accruing at the rate of $13.81 per day from May 1, 1983, up to the date on which the decree is entered, plus interest thereafter of ___%, according to law, plus attorneys' fees in the amount of $3,000.00;

c. To the payment of $130,358.50 to plaintiff, with future interest accruing at the rate of 10% per annum from May 1, 1983, up to the date on which the decree is entered, plus interest thereafter of ___% per annum, according to law, plus costs, disbursements, and expenses.

Each paragraph set out the contractual rate of interest ($13.81 per day on the bank's debt is 18% per year) running from May 1 until entry of judgment, followed by a blank to be filled in "according to law."

One might suppose that the "law" in question was 28 U.S.C. § 1961(a).

The decree was entered on May 25, 1983. On that date the rate of interest required by § 1961(a) was 8.72% per year. Both blanks were filled in, although we do not know when or by whom. The blank in paragraph (c) contains a handwritten "8.72", the legal rate. The blank in paragraph (b) contains a typewritten "18", the contractual rate. No one brought the discrepancy to the district court's attention until after the sale took place.

Immediately before the sale in January 1985, Merrill Moores, an attorney, bought Carmel Bank's interest in the judgment. Moores then purchased the property at the sale for $115,001, exactly $1 more than the United States bid. Moores paid the sum to the Marshal, but as the owner of the bank's interest in the judgment Moores is entitled to cash back. The question is how much. The difference is substantial. The debt to the bank was $37,637 on May 25, 1983, when the judgment was entered. With interest compounded yearly at 18%, the entitlement will be worth about $58,600 by February 1, 1986, while if the rate is 8.72% the entitlement will be worth about $47,100.

The United States wants to receive as much of the $115,001 as possible, and it asked the district court to change the 18% rate in paragraph (b) to the legal rate of 8.72%. The court complied. Moores then asked the court to restore the original rate. The court reaffirmed its decision in a thoughtful opinion. The district judge agreed with Moores that the party seeking an alteration of a judgment under Rule 60(a) must show "a clear entitlement to an interest award [and] ... automatic application and mechanical calculation of the award, with no exercise of discretion...." The court thought that Moores loses under this standard because 28 U.S.C. § 1961(a) leaves courts with no discretion and because the consent decree created two blanks, each to be filled in "according to law." As a result, "[t]he entry of the 18% interest rate clearly was not intended by

the parties and was an error caused by clerical mistake and oversight."

## II

The consent decree called for a single number, the rate "according to law", to be inserted in each of two blanks. Different numbers ended up in these blanks—the contractual rate in one and the rate "according to law" in the other. It is therefore apparent on the face of the document that something went wrong.[1] We do not know who wrote the numbers in the blanks or when; we know only that a mistake was made. Our question is whether this blunder is best characterized as a "clerical mistake" that may be corrected under Rule 60(a) at any time, as a "mistake [or] inadvertence" that may be corrected under Rule 60(b)(1) on motion filed within a year, or as a legal error that may be corrected under Rule 59(e) on motion filed within 10 days.

The polar cases are clear. If the parties had actually bargained for a rate of 18%, believing it to be authorized by law, they could not use Rule 60(a) to substitute a fresh bargain. The Rule does not permit alterations of factual and legal decisions deliberately made. *Hoffman v. Celebrezze*, 405 F.2d 833 (8th Cir.1969). On the other hand, suppose the blanks had been left empty through the date of the sale. They could be filled in later, on the authority of Rule 60(a), to complete the bargain. Or suppose a decimal point had been misplaced, so that the bank's interest was "87.2%" instead of "8.72%". Again the mistake would be a scrivener's error. See *Allied Materials Corp. v. Superior Products Co.*, 620 F.2d 224 (10th Cir.1980). Suppose finally that the consent decree had stated that interest was to be "according to law" but had left no blanks, and the rate had never been identified. Then a court may specify the appropriate rate at any time. *United States v. Kenner*, 455 F.2d 1, 5–6 (7th Cir.1972).

*Kenner*, which allowed a district court to establish a rate of interest several years after the entry of judgment, is close but not dispositive. In *Kenner*, as here, the judgment called for the legal rate of interest; in *Kenner* the judgment was silent on what that rate might be, while this judgment said "18%". But the only reasons why the use of an incorrect number might matter are reliance and an actual agreement to employ the wrong number. The bank did not rely to its detriment on the error, and the consent judgment does not embody an actual agreement on anything other than the rate of interest determined "according to law." (We address in Part III whether Moores has an independent claim of reliance.) The amendment of the judgment to replace "18%" with "8.72%" therefore carries out the principal function of Rule 60(a)—protecting the court's (or the parties') actual meaning from mistakes in implementation. See 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2854 pp. 149, 154 (1973); 6A J. Moore, *Moore's Federal Practice* ¶ 60.06[1] pp. 60–41 to –42, 60–52 (1983). District courts enter thousands of judgments every year, so there are bound to be some mistakes between the design of a judgment and its implementation. There are two ways to deal with these—to scrutinize every judgment with great care, and to use less care but correct scriveners' errors that show up later. If errors are few, then subsequent correction is on balance the better device. Rule 60(a) embodies a conclusion that subsequent correction is preferable to greater vigilance (plus a rule of preclusion).

█ If the flaw lies in the translation of the original meaning to the judgment, then Rule 60(a) allows a correction; if the judgment captures the original meaning but is

---

1. Moores contended at oral argument that the parties may have bargained for the 18% contract rate, so that the mistake lies in the description "according to law." But if the parties bargained for the contract rate, why did they leave a blank to be filled in later? The contract rate was known from the start. Moores also properly concedes that § 1961(a) would have made a bargain for the contract rate unlawful. We therefore think that the consent decree must mean what it says, that the parties wanted the rate "according to law" inserted in each blank.

infected by error, then the parties must seek another source of authority to correct the mistake. So read, Rule 60(a) preserves the stability of judgments, an important interest of everyone in the legal system. See *Metlyn Realty Corp. v. Esmark, Inc.,* 763 F.2d 826, 830–32 (7th Cir.1985).

The distinction between changes that implement the original meaning and changes that alter the original meaning to correct a legal or factual error explains the divergent cases applying Rule 60(a) to errors in awards of interest. Many cases hold that Rule 60(a) may not be used to correct mistaken rates of interest or omitted awards of interest. E.g., *Scola v. Boat Francis R., Inc.,* 618 F.2d 147 (1st Cir.1980); *Warner v. City of Bay St. Louis,* 526 F.2d 1211 (5th Cir.1976); *Hoffman v. Celebrezze, supra; Gray v. Dukedom Bank,* 216 F.2d 108 (6th Cir.1954). Others hold that Rule 60(a) may be used to produce a correct rate of interest. See, in addition to our decision in *Kenner, supra, Stovall v. Illinois Central Gulf R.R.,* 722 F.2d 190 (5th Cir.1984); *Lee v. Joseph E. Seagram & Sons, Inc.,* 592 F.2d 39 (2d Cir.1979); *Glick v. White Motor Co.,* 458 F.2d 1287 (3d Cir.1972).

The appearance of conflict among these cases is an illusion. In *Scola* the judge had discretion over interest, so that a failure to award interest in the judgment reflected a legal and factual decision rather than an oversight. In *Hoffman* the parties agreed on an award of interest. It later turned out that their agreement was based on a mistake of law; still the judgment implemented the original meaning, so that it was necessary to seek another source of authority to correct the mistake. In *Warner* the district court awarded interest at 6%, meaning to do just this; when the court discovered that the law required the award to be 8%, it had to search for authority outside Rule 60(a).

By contrast, in *Stovall* the judgment specified 6% interest, "the legal rate," without stating whether interest would be compounded. The court held that Rule 60(a) could be used to make the judgment conform to the correct legal rate: 6% compounded annually. In *Lee* the district court specified the amount of damages and turned matters over to the clerk, anticipating that the clerk would add any interest that was mandatory under the governing law. The court neglected interest. The availability of pre-verdict interest depended on fixing a starting date, which was an adjudicatory task. Neither the jury nor the judge fixed a date, and the court of appeals held that the determination of the date was not within Rule 60(a). Post-verdict (yet pre-judgment) interest was mandatory, however, and there was no difficulty fixing a starting date. The court of appeals held that the omission of this mandatory interest may be corrected under Rule 60(a). 592 F.2d at 41–42. The thread uniting these cases is that factual and legal misconceptions, as well as exercises of discretion, may not be corrected under Rule 60(a), while blunders in execution may be.

■ In this case the parties agreed to use the legal rate of interest and left blanks for the insertion of that rate. Correction of the judgment restores the original meaning. Whoever typed "18%" in one blank was sleepwalking. The change to the correct figure of 8.72% may unsettle expectations, but many alterations of judgments under Rule 60(a) have ·significant effects. Why else do people seek alterations of the judgments? The Rule applies to all clerical miscues, trivial and important alike.

### III

■ Moores stresses that he is a stranger to all of this. He bought the bank's interest in the judgment, perhaps for a price that reflected an assumption that interest was running at 18% rather than 8.72%. Moores insists that the loss from the mistaken interest rate should fall on the United States, because it could have protected itself while he could not. We must decide whether Moores' status as a purchaser of the judgment affects the operation of Rule 60(a).

█ The answer is no. No case holds that the purchaser of an interest in a judgment should be treated differently from the party named in the judgment. Moores may have expectations, and one function of the law is to protect expectations. Another function of the law is to reach correct results. Rule 60(a) mediates between the interest in finality and the interest in accuracy. It does this by a combination of a very small scope ("clerical" mistakes) and an unlimited time; Rule 60(b)(1) allows correction of additional errors and difficulties, but it has a year's deadline. The balance, to which we must adhere, is that when the error is "clerical" the time of correction does not matter.

The tension between the protection of expectations and the pursuit of accuracy is not unique to judgments. In commercial law parties often sell or assign interests in notes and other contracts. The venerable rule governing such transactions is that the purchaser of a negotiable instrument for value and without notice of any defect acquires the instrument free of claims and defenses that would apply to the transferor. See § 3–305 of the Uniform Commercial Code; Farnsworth, *Contracts* 783 (1982). Someone who signs a negotiable obligation knows that claims may be transferred to a holder in due course, and this prospect may influence the price. The difficulty of asserting defenses against a holder in due course may make the transaction less attractive to the maker of the note, but it also increases the liquidity of the obligation as the other party sees things, and so may lead it to offer a better deal.

Purchasers of non-negotiable obligations, by contrast, take them subject to all defenses—no matter how late these defenses may arise, and no matter how much they may unsettle expectations. The contract-

ing parties can act with greater assurance in the sense that their original bargain will survive subsequent transfers. The obligor's expectations are not affected by subsequent transactions it cannot control. If an event later unsettles the contract, the buyer of the contract right will not receive what it expected (the performance of the obligor) but must settle for its remedies against the party from which it acquired the rights.

This approach is imperfect, as are all rough compromises, but a court ought not invent some new accommodation when the judgment of time so strongly favors drawing a line based on negotiability. Moores therefore acquired his interest subject to every uncertainty Carmel Bank itself faced. A judgment is not a negotiable instrument within the meaning of the Uniform Commercial Code. See UCC § 3–104. We therefore treat Moores as if he were Carmel Bank, and Moores in return may have a right of action against the bank.[2]

█ Moores might have sought a different sanctuary. A foreclosure sale is designed to settle all outstanding rights and to convey a clear title for a known price. A variety of legal doctrines therefore inhibit attempts to revisit events that took place before the sale. See *Federal Deposit Insurance Corp. v. Meyer*, 781 F.2d 1260, 1263–66 (7th Cir. 1986). Moores did not argue in the district court that the foreclosure sale cut off the government's right to seek relief under Rule 60(a), and he has not argued so to us either. In civil litigation an appellate court ordinarily may not reverse a judgment on a ground not presented by the appellant. E.g., *United States v. Gimbel*, 782 F.2d 89, 91–93 (7th Cir. 1986); *Erff v. MarkHon Industries, Inc.*, 781 F.2d 613, 618–19 (7th Cir. 1986); *General Motors Acceptance Corp. v. Central National Bank of Mattoon*, 773 F.2d 771, 778 n. 5 (7th

**2.** This, too, is a subject of contract. Moores may have purchased the bank's interest without recourse. The record does not contain the contract between Moores and the bank, although Moores could have supplied that contract (and any other information he wished) with his motion to restore the 18% rate. Indeed, for all we know Moores and the bank recognized the defect in the 18% rate and contracted based on differing views of the probability that a court would change the rate. Whether they did or not, the matter is wholly between them and does not affect the rights of the United States.

Cir.1985); *Walker v. Maccabees Mutual Life Insurance Co.*, 753 F.2d 599, 602 (7th Cir.1985). Parties to civil cases are bound by acts and omissions alike, see *Will v. Comprehensive Accounting Corp.*, 776 F.2d 665, 675 (7th Cir.1985), and we therefore do not decide the effect of foreclosure sales on efforts to alter judgments under Rule 60(a).

## IV

The error in the rate of interest was not the only mistake in this case. Although all people with interests in the real estate should be notified of foreclosure proceedings, see Ind.Code § 32–8–18–1, this did not happen here. The City of Indianapolis has an interest in the property that antedates both mortgages. The interest, called a "Barrett Law Assessment," represents fees for improvements and stands directly behind taxes in the statutory priority of interests in land. See Ind.Code § 36–9–20–14. The Barrett Law Assessment was filed as a lien against the property, but the United States did not notify the City of the impending foreclosure.

The failure of notice did not affect the lien. It passed through the sale as a top priority charge against the property. But Indianapolis would prefer to collect its $5,000 from the fund in court rather than keep its lien, and Moores would prefer to take the property free of liens rather than stand second in line. The record does not reflect whether Moores knew about the Barrett Law Assessment when he bid at the sale, but shortly after the sale he notified the Comptroller of Indianapolis, who appeared and asked the court for cash from the fund. The district court granted the application, and the United States filed an

appeal, arguing that Indianapolis did not formally move to intervene and anyway that the motion came too late.

 The City's motion was not styled one for intervention, but a court is entitled to disregard labels and treat pleadings for what they are. This was a request for intervention, as it could be nothing else. The request came late, and Fed.R.Civ.P. 24 requires an application for intervention to be "timely." Yet an application may be accepted even if filed after judgment. Timeliness depends on the dispatch with which the intervenor acts after learning of the grounds for intervention and on the extent to which belated intervention will cause prejudice to other litigants. *United Airlines, Inc. v. MacDonald*, 432 U.S. 385, 394–96, 97 S.Ct. 2464, 2469–71, 53 L.Ed.2d 423 (1977); *NAACP v. New York*, 413 U.S. 345, 366–69, 93 S.Ct. 2591, 2603–04, 37 L.Ed.2d 648 (1973).

 The City acted promptly after it received notice of the foreclosure. The City's intervention harmed the United States in the trivial sense that the Treasury is $5,000 poorer after the intervention than it was before. But the United States was supposed to notify the City back in 1983; had it done this, the City would have appeared to claim its $5,000. A belated intervention could have injured the United States only if all bidders at the sale had known about the assessment. Knowledgeable bidders would have subtracted $5,000 from their valuations, knowing that the City would own that much of the property by virtue of its lien. If the bidders had cut their price by $5,000 and the court nonetheless had paid the City from the fund, this would have transferred $5,000 from the United States to the successful bidder.[3] The United

---

**3.** An illustration shows how. Suppose a parcel is worth $100,000, is subject to a $5,000 Barrett Law Assessment, and has a $30,000 first mortgage that will be paid from the fund created by the sale. The residual interest of the United States is worth $65,000. Bidders aware of the Barrett Law Assessment would not offer more than $95,000, because that is all the equity available for purchase. This works out all right if the Barrett Law Assessment passes through the

sale: the bidder pays $95,000 for $100,000 worth of property saddled with a $5,000 lien; the first mortgagee gets $30,000; the City keeps its lien; and the United States gets $65,000. If the City intervenes after the sale, however, the United States loses and the bidder gains: the bidder pays $95,000 for clear title to property worth $100,000; the first mortgagee gets $30,000; the City gets $5,000; and the United States realizes $60,000 on its equity of $65,000.

States did not argue that it suffered this kind of prejudice, however, and we will not reverse a civil judgment on an argument no party has made. It is also unlikely that prejudice occurred. The foreclosure sale was an open outcry auction, at which the United States bid $115,000. Moores prevailed by bidding an extra ·dollar. He stopped bidding because he had won, not because he anticipated the need to pay $5,000 to the City.

Just as Moores must look to the bank to settle accounts that have been disturbed by the alteration of the judgment, so the United States must look to. whoever performed the title search that failed to turn up the City's lien. Because the United States has not demonstrated prejudice, the City is entitled to its cash. The United States gets the benefit of the adjustment of interest, Moores gets clear title, and the judgment is

AFFIRMED