UNITED STATES of America, Plaintiff-Appellee,

v.

MEDICO INDUSTRIES, INC., Defendant-Appellant.

No. 85–1885.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 14, 1986.
Decided Feb. 27, 1986.

Glade F. Flake, Glade F. Flake & Assoc., Chevy Chase, Md., for defendant-appellant.

Lori F. Fischler, U.S. Dept. of Justice, Washington, D.C., for plaintiff-appellee.

Before POSNER, FLAUM and EASTER-BROOK, Circuit Judges.

**EASTERBROOK, Circuit Judge.**

From July 1967 through August 1973 Edward F. Hill was a Supervisory Contract Specialist of the Army Munitions Command. Hill negotiated and supervised contracts for ordinance. In May 1973 the Command awarded three contracts for 60mm mortar rounds. Two of these went to Medico Industries, the third to Airport Machining Corp. Hill was the contracting officer for all three. Airport Machining entered bankruptcy proceedings in June 1973. So before Hill left the Command in August, he knew that the government probably would need to contract for more 60mm rounds.

Hill formed Vertex Consultants, Inc., which offered to assist firms seeking to negotiate with the Command. Medico retained Hill, and Hill helped Medico to prepare an unsolicited proposal in December 1973 to supply more 60mm rounds. This proposal incorporated all specifications of the contracts Hill had negotiated in May. Hill negotiated the proposal by phone with Donna Freels, his former subordinate at the Command, who had assumed his position. He was chief spokesman for Medico on all questions except delivery schedules. In January 1974 the Command terminated its contract with Airport Machining and awarded Medico a portion of this work. The new award to Medico was designated Modification P0002 to Contract DAAA09–73–C–0259, one of the contracts awarded in May 1973. Modification '002 covered 1,815,000 shells, and all specifications except price, quantity, and delivery dates were identical to those in contract '259.

Medico later claimed that the technical specifications of contract '259 and modification '002 should be altered and a price adjustment made. Hill again represented Medico in seeking these modifications. The Command rejected Medico's proposed changes, and the parties took their dispute to the Armed Services Board of Contract Appeals. The United States then announced its intent to cancel both contract '259 and modification '002 on the ground that Hill had a conflict of interest, in violation of 18 U.S.C. § 207, and it disclaimed liability to Medico before the Board (where the case is pending still).

The government seeks a declaratory judgment that it is entitled to cancel the contract and is not liable to Medico. The district court initially held that the Board should consider these contentions, but we held that the Board lacks authority to do so and reversed. 685 F.2d 230 (7th Cir.1982). The district court then granted summary judgment to the United States, 609 F.Supp. 98 (N.D.Ill.1985). Although the district court gave several reasons, we need consider only one: whether contract '259 and modification '002 are the same "contract" within the meaning of § 207(a).

As it stood between 1962 and 1978, § 207(a) prohibited any former employee of the United States from acting "as agent or attorney for anyone other than the United States in connection with any ... contract, claim, ... or other particular matter involving a specific party or parties in which the United States is a party ... and in which he participated personally and substantially as an officer or employee". (The statute grew longer in 1978, but the critical language of subsection (a) did not change.) Modification '002 is part of contract '259, and so Hill stands on both sides of the same "contract." Medico insists nonetheless that modification '002 is "really" a different contract, that it is a new procurement appended to contract '259 at the Army's choice and for the government's convenience. This requires us to examine the meaning of § 207(a).

Until 1962 a hodgepodge of statutes dealt with conflicts of interest in different agencies. These statutes were conflicting, incomplete in some applications and overbroad in others. Congress revised the prohibitions from the ground up, repealing the existing rules and enacting new statutes (18 U.S.C. §§ 201–09) of general application. The House report, H.R.Rep. No. 748, 87th Cong., 1st Sess. (1961), states one function of the new laws: to implement the principle "that a public servant owes undi-

vided loyalty to the Government" (*id.* at 3). See also S.Rep. No. 2213, 87th Cong., 2d Sess. (1962). Section 207(a) carries out the plan by outlawing a change of sides on the same "particular matter." According to the committee, "an official should be prohibited from resigning his position and 'switching sides' in a matter which was before him in his official capacity." House Report at 4. The committee did not discuss what a "matter" might be, however, apparently deeming that too plain for comment.

Many employees of the government are experts in particular fields. A broad construction of "particular matter" might make it very difficult for these people, their human capital heavily invested in a single subject, to leave the government for a private employer that deals extensively with the government. The "revolving door"—the movement from private employment to the government and back—has benefits for the government as well as drawbacks. On the one hand it creates a risk of conflict of interest, a risk that people who hope to move to the private sector will favor while in public employment those firms they think may offer rewards later, and after these employees switch to the private side they may exercise undue influence on those they leave behind (who may seek to follow the same path, or may just need some of the information the departing employee took with him). On the other hand offering the opportunity to move from private to public employment and back again may enable the government to secure the services of skilled people who are unwilling to devote their careers to public service at current rates of pay. The government can hire people for less, and attract specially skilled agents, if it allows them to put their skills to use later for private employers. It is therefore important to define "particular matter" broadly enough to prevent disloyalty without defining it so broadly that the government loses the services of those who contemplate private careers following public service.

■ Section 207(a) was drafted with these concerns in mind. The employee is disqualified only if the contract or other particular matter involves the same "specific party or parties". So we take it that an official who drafts specifications for a weapon may represent people who later submit bids to make the weapon; specifications (or regulations) do not have "specific parties." A scientist who analyzes a new chemical could do further work on that chemical for a private employer; there would be no overlap of parties. Similarly a lawyer would be free to represent a firm even though he had been the government's attorney in a different suit against that firm. This time there would be no overlap of the subject matter. Even when the subject is the same, the facts must overlap substantially. See *CACI, Inc. v. United States*, 719 F.2d 1567, 1575–76 (Fed.Cir. 1983), which holds that a contract for data processing is not the same "contract" as earlier data processing agreements because, although one followed the others, the specifications evolved enough to make the course of performance significantly different. To put these limits together: The parties, facts, and subject matter must coincide to trigger the prohibition of § 207(a). See B. Manning, *Federal Conflict of Interest Law* 204 (1964) (the statute is concerned with switching sides on "discrete and isolable transactions between identifiable parties").

■ Too, the officer is disqualified only if he participated "personally and substantially" in the contract or other matter; if the matter was just within his job description, but he did not work on it himself, the officer would be free to represent a private party after leaving the government. Finally, a proviso to former § 207 (now § 207(f)) allows the head of an agency to lift the application of § 207(a) in writing (and after publication in the Federal Register) when the employee has scientific or technical knowledge. These restrictions make it plausible to read "contract ... or other particular matter" more broadly than the four corners of a single document, to treat the language as covering a "nucleus of operative facts" (to borrow from the law

of res judicata), for this will not jeopardize the government's ability to attract capable employees.

■ It would be unwise to essay a definition of "contract ... or other particular matter" in this case, because any reasonable breadth is sufficient for one "contract" to comprise contract '259 and modification '002. Both concern the same artillery shells, known as M49A3 60mm ammunition. Modification '002 does little except add 1.8 million shells to the number procured under contract '259. Modification '002 substitutes shells from Medico for shells from Airport Machining; Hill negotiated the original contracts with both Medico and Airport Machining and knew before he left the Command that someone would have to step into Airport Machining's shoes. The parties, the facts, and the subject matter are the same in contract '259 and modification '002. Nothing more is required. Hill's change of sides therefore violated § 207(a).[1]

■ That Hill did not use any "inside information" on Medico's behalf or temper his vigorous pursuit of the Army's interests before August 1973 is irrelevant; § 207(a) avoids any reference to such difficult-to-prove events. So, too, it does not matter that technical specialists rather than Hill wrote the specifications for M49A3 60mm ammunition. The statute grew out of concerns about the misuse of information and divided loyalties, see Senate Report at 4, but is not limited to them.

■ A legislature that seeks to achieve a goal (such as reducing misuse of information or the exercise of undue influence on one's former subordinates) can do so in one of two ways. First, it may identify the objective and instruct courts or agencies to design rules to achieve more of that objec-

tive. This method permits fine tuning in individual cases at the expense of imprecision and uncertainty in the run of cases. Second, Congress may pick the rules itself and make them the measure of the objective. The selection of the rule denotes what the goal is worth to Congress, how best to achieve that goal, where to stop in pursuit of the goal. See *Mercado v. Calumet Federal Savings & Loan Ass'n,* 763 F.2d 269, 271–72 (7th Cir.1985). Any rule of this character will overshoot in some respects and fall short in others. In other words, it will be overbroad and have loopholes at the same time. Yet a court may not convert a rule into a general standard without reversing the choice Congress made. When Congress chooses the rule rather than the objective, a court must turn aside claims of the sort Medico makes—that its conduct does not undercut the legislature's objective and therefore should be permitted. See *TVA v. Hill,* 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Congress rejected that sort of claim when it chose to write a sharp rule rather than a statute such as "No employee of the government shall change sides where that creates a significant risk of injury to the legitimate interests of the United States."

■ Medico argues that the contract should not be abrogated even if Hill violated § 207(a). This is a change of heart. In the district court the parties did "not dispute that the effect of a § 207 violation is to render any contract tainted with such conflict unenforceable." 609 F.Supp. at 101. The change of heart comes too late. In all but extraordinary circumstances, a party to a civil case may not present on appeal an issue not preserved in the district court. See *United States v. Griffin,* 782 F.2d 1393, 1398 (7th Cir.1986) (collecting cases). There is nothing extraordinary

1. The district judge did not consider this ground when granting summary judgment because she found that Hill's change of sides presented a sufficient danger of improper use of knowledge and of improper influence over his former subordinate. (An earlier opinion had rejected this ground pending further discovery.) The United States presented this ground to the district

court, however, and we may affirm the judgment on any ground properly preserved. *Massachusetts Mutual Life Ins. Co. v. Ludwig,* 426 U.S. 479, 96 S.Ct. 2158, 48 L.Ed.2d 784 (1976). The material facts are not in dispute, given our view of the few facts material to the identification of a "contract" under § 207(a).

about this case. True, § 207 is a criminal statute and does not authorize the avoidance of contracts. Under current principles for the implication of rights of action from penal statutes, it is doubtful that a court would infer this additional remedy. *California v. Sierra Club*, 451 U.S. 287, 101 S.Ct. 1775, 68 L.Ed.2d 101 (1981). Yet when it was freer with the creation of additional remedies, the Supreme Court held that a violation of one of the predecessors of § 208 nullifies the contract. *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 563–66, 81 S.Ct. 294, 315–17, 5 L.Ed.2d 268 (1961). See also *United States v. Acme Process Equipment Co.*, 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966). Rights of action created under earlier rules have been left in place. E.g., *Herman & MacLean v. Huddleston*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983); *Touche Ross & Co. v. Redington*, 442 U.S. 560, 577, 99 S.Ct. 2479, 2489–90, 61 L.Ed.2d 82 (1979). When Congress enacted § 207, the prevailing view was the one stated in *Mississippi Valley*. Cf. *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 378–82, 102 S.Ct. 1825, 1839–41, 72 L.Ed.2d 182 (1982). Whether the view in *Mississippi Valley* survived (it was not mentioned in the committee reports) we need not resolve.

■ Medico preserved only an effort to distinguish *Mississippi Valley* on the ground that Hill was an employee of Vertex Consultants rather than of Medico. This does not matter, however. Medico knew that in using Hill's services it was negotiating through the contracting officer of contract '259. In *Acme* the offending employees acted without the knowledge of the managers of the firm, yet the Court held that the firm's contractual rights were forfeit. Hill acted with the knowledge of Medico; that Hill was an independent contractor is an irrelevant detail. If Hill misrepresented to Medico the propriety of his acts, Medico may have an action against Hill. The contractual form of the dealings between Hill and Medico does not affect their rights against the United States, a stranger to their arrangement.

■ Medico's final argument is that the government is estopped to enforce § 207(a) because in June 1974 Hill wrote to the Commanding General of the Army Armament Command and requested the General's opinion whether Hill could represent Medico in seeking further modifications of modification '002. The general did not answer Hill's letter. It does not matter. By June 1974 it was too late; Hill has represented Medico in the initial negotiation of modification '002 in December 1973 and January 1974.

■ At all events, generals are not authorized to waive the application of § 207(a). The statute does contain a proviso allowing employees to switch sides, but they must be scientific or technical employees, and even so the permission must be in writing and published in the Federal Register. This forecloses "permission" granted to Hill by way of the general's inattention to his mail. In *Mississippi Valley* an officer of the government explicitly authorized the person in question to act both for the government and for the private employer. The Court held this express authorization to be irrelevant. 364 U.S. at 560–61, 81 S.Ct. at 314–15. It pointed out that employees of the United States may not excuse violations of criminal statutes. This is especially so where, as here, the addressee of the request for permission may be contemplating changing sides himself.

■ Criminal statutes such as § 207(a) do not depend for their effectiveness on the words and acts of employees of the government. They operate by force of Congress' decision, not by leave of miscellaneous generals and other subordinate officers. As with other claims of estoppel against the government, the question is: "Who is in charge here, Congress and the President or subordinate officials?" Congress and the President are in charge, and their decisions must be followed. "Estoppel" is just a way to describe a decision of a subordinate official that prevails over a decision of the political branches expressed in a law or regulation. Because subordinate officials

are not running the show, the United States may not be estopped by the inaction or erroneous action of its employees unless statutes or regulations confer on the subordinates in question the power to bind the United States.[2] See *Schweiker v. Hansen,* 450 U.S. 785, 101 S.Ct. 1468, 67 L.Ed.2d 685 (1981); *INS v. Hibi,* 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973); *Federal Crop Insurance Corp. v. Merrill,* 332 U.S. 380, 68 S.Ct. 1, 92 L.Ed. 10 (1947). See also *Heckler v. Community Health Services, Inc.,* 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). Section 207 does not allow subordinate officials to establish rules of their own choosing.

AFFIRMED.

2. The Supreme Court has yet to decide whether "affirmative misconduct" by a subordinate official may estop the United States. There was none here, so we express no opinion on that subject. Similarly, the rule in our circuit allowing agents engaged in proprietary activities to estop the government if the agents have apparent authority to make binding contracts and try to make such contracts, see *Azar v. U.S. Postal Service,* 777 F.2d 1265 (7th Cir.1985), does not affect this case. The acquisition of munitions is not proprietary, and the general did not purport to make a contract with Hill.