**UNITED STATES of America ex rel. Joseph T. SIEWICK, Appellant,**

v.

**JAMIESON SCIENCE AND ENGINEERING, INC., et al., Appellees.**

No. 99–7090.

United States Court of Appeals, District of Columbia Circuit.

Argued Feb. 8, 2000.

Decided June 30, 2000.

Joseph J. Aronica argued the cause for appellant. With him on the briefs was Robert B. Norris.

Gary Howard Simpson argued the cause and filed the brief for appellees.

Before: WILLIAMS, HENDERSON and RANDOLPH, Circuit Judges.

Opinion for the Court filed by Circuit Judge STEPHEN F. WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

Any person can initiate a lawsuit in the name of the United States for substantive violations of the False Claims Act (the "Act" or "FCA"). See 31 U.S.C. § 3730(b) (authorizing action by a "person"). Such violations include presenting to the government "a false or fraudulent claim for payment or approval." See *id.* § 3729(a) (establishing liability). Here the non-government person (known as the relator), Dr. Joseph T. Siewick, a physicist hired by Jamieson Science and Engineering, Inc. ("JSE") in May 1990 but laid off in December 1991, presses a claim against JSE and two of its officers at the relevant time, Vincent T. O'Connor and Dr. John A. Jamieson. He argues that the monthly invoices that JSE submitted to the government for payment under government contracts were false claims. They were false, in his view, because JSE filed them notwithstanding alleged violations by O'Connor of a criminal statute aimed at "revolving door" abuses by former government employees, 18 U.S.C. § 207.

Siewick proposes two theories to support the alleged falsity. First, he says, the certified invoices implicitly declared "compliance with applicable law, including Section 207," and thus were "impliedly false." Appellant's Br. at 11. Second, Siewick argues that a violation of § 207 renders a government contract unenforceable. From this supposed unenforceability he reasons that both O'Connor and Jamieson knew that JSE was not entitled to the payments JSE requested, so JSE's invoices claiming that JSE was entitled to payment were false.

Neither of Siewick's theories convinces us that the alleged § 207 violations transformed JSE's invoices into the type of false claims made actionable by the *qui tam* provisions of the FCA. We affirm the district court's grant of partial summary judgment.

\* \* \*

In 1986, the Strategic Defense Initiative Organization ("SDIO") sought proposals for a project assessing its infrared sensors and related technology. O'Connor was the contract officer assigned to the project and consequently received the proposal submitted by JSE. Although he didn't have the power to choose the winning bidder, he was assigned the task of negotiating JSE's fee and the final contract price. After a day of negotiations, the contract was signed on December 8, 1986 by O'Connor for the United States and Jamieson for JSE. O'Connor retained some role in ad-

ministering the contract, but the parties disagree as to its scope.

In the summer of 1987, O'Connor decided to leave government service. He filed the requisite notice indicating his intention to retire and began discussing employment opportunities with government contractors. A technical representative within SDIO, Peter Franklin, mentioned to Jamieson that O'Connor was retiring and that he would be a helpful addition to JSE's staff. And after Jamieson and O'Connor met, Jamieson offered O'Connor the job of Executive Vice President of JSE, which he accepted as of November 1, 1987.

JSE bid on and received a second and third contract as the previous contracts expired. Siewick alleges that in representing JSE in matters related to these contracts, O'Connor repeatedly violated 18 U.S.C. § 207. According to Siewick, these violations began even before O'Connor had fully parted company with the Navy (he had been on terminal leave from November 1, 1987 to January 1, 1988) and continued through to the period covered by the third contract. Siewick claims that these violations taint nearly every invoice submitted on the three contracts.

The district court granted summary judgment in favor of the defendants on the claims premised upon § 207 violations. The court found both that Siewick's evidence was insufficient as a matter of law to prove a violation of § 207 and that even if § 207 had been violated, the violation did not transform the invoices into false claims. But it denied the defendants' motion for summary judgment on Siewick's claims premised upon padding and falsification of timesheets; those claims remain before the district court. Siewick requested that the district court enter final judgment pursuant to Fed.R.Civ.P. 54(b) on his § 207 claims, and the district court granted this request after explicitly finding no just reason for delay. Siewick filed a timely appeal.

■ After hearing oral argument we ordered this case held in abeyance pending the Supreme Court's decision in *Vermont Agency of Natural Resources v. United States ex rel. Stevens,* —— U.S. ——, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000); the Court had expressed interest in standing in *qui tam* actions generally, *Stevens,* —— U.S. at ——, 120 S.Ct. at 523 (expanding cert. grant). As the Court ultimately found no generic lack of standing, *Stevens,* —— U.S. at ——, ——, 120 S.Ct. at 1863, 1865, and as we see no particular infirmity here, we turn to the merits.

* * *

■ We review a district court's grant of summary judgment de novo; a party is not entitled to summary judgment if a reasonable jury could return a verdict for the nonmoving party. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Aka v. Washington Hosp. Ctr.,* 156 F.3d 1284, 1288 (D.C.Cir.1998) (en banc). We assume in favor of Siewick that his case could withstand summary judgment on the proposition that JSE violated § 207. But we find that § 207 violations would not in themselves render JSE's invoices "false claims" covered by the Act.

The Act establishes liability for anyone who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1). Siewick's problem is that because of defects in his theories and the evidence, a reasonable jury could not find that JSE knowingly presented a false or fraudulent claim.

■ For both theories it is essential that the vouchers and invoices at issue here constitute "claims" within the meaning of the Act. They do. A "claim" is "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient." *Id.* § 3729(c). Indeed, any request for payment is properly

considered a claim for purposes of the FCA. See *United States v. Neifert–White Co.*, 390 U.S. 228, 233, 88 S.Ct. 959, 19 L.Ed.2d 1061 (1968); see also *United States ex. rel. Schwedt v. Planning Research Corp.*, 59 F.3d 196, 203 (D.C.Cir. 1995).

Siewick's first theory—that the vouchers made an "implicit certification" of non-violation of § 207—is a non-starter. It is doomed by the rule, adopted by all courts of appeals to have addressed the matter, that a false certification of compliance with a statute or regulation cannot serve as the basis for a *qui tam* action under the FCA unless payment is conditioned on that certification. As the Ninth Circuit said,

> Violations of laws, rules, or regulations alone do not create a cause of action under the FCA. It is the false *certification* of compliance which creates liability *when certification is a prerequisite to obtaining a government benefit.*

*United States ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir.1996) (second emphasis added). Courts have been ready to infer certification from silence, but only where certification was a prerequisite to the government action sought. See, e.g., *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 793 (4th Cir.1999) ("[The FCA] claim fails on the pleadings because [the relator] has never asserted that such implied certifications were in any way related to, let alone prerequisites for, receiving continued funding."). See also *United States ex rel. Weinberger v. Equifax, Inc.*, 557 F.2d 456, 461 (5th Cir.1977); compare *United States ex rel. Thompson v. Columbia/HCA Healthcare Corp.*, 125 F.3d 899, 902 (5th Cir.1997) (seeming to require that the certification be a prerequisite to receiving funds before liability under the FCA can attach, even where the certification is express: "false certifications of compliance create liability under the FCA when certification is a prerequisite to obtaining a government benefit."). Siewick points to nothing suggesting that

JSE was required to certify compliance with § 207 as a condition of its contract. Thus his claim of implied certification fails.

The assessment of Siewick's second theory—that JSE's invoices contained "expressly false" statements—turns in part on the FCA's definition of "knowingly." It says that a defendant acts "knowingly" if he "(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." *Id.* § 3729(b). The key issue, then, is whether (assuming violations of § 207) JSE's claims were knowingly false or fraudulent.

The invoices in the record request that the U.S. Government pay JSE "the sums owing for all work performed" under the relevant contract and certify that (1) "all these charges are for work authorized and performed under the referenced contract and that payment has not been received," (2) "all claims are consistent with this clause," and (3) "the required deliveries ... have been made to the distribution specified in the contract." The parties agree that these statements "inform[ ] the government that work which entitles JSE to reimbursement has been performed." See Appellee's Br. at 27. Siewick's argument is that JSE knew that the contract was void *or* voidable (Siewick flips back and forth between these characterizations), and thus knew that it was not entitled to be paid.

A void contract is one under which the promisor has no duty of performance. See Restatement (Second) of Contracts § 7 cmt. a. (Indeed, some purists say that a "void contract" is a contradiction in terms, because the word contract always includes some element of enforceability. See 1 Joseph M. Perillo, Corbin on Contracts § 1.7 (rev. ed.1993)). A voidable contract is one under which a party, usually a victim of some wrong by another party, may *"elect"* to avoid any legal obligations. Restatement (Second) of Con-

tracts § 7.[1] The first category is generally reserved for a handful of contracts that are seen as being in fundamental violation of public policy, such as agreements to do acts that both parties know will constitute a felony, see Corbin on Contracts § 1.7, or wagering agreements made in jurisdictions where gambling is illegal, see 7 Richard A. Lord, Williston on Contracts § 17:22 (4th ed.1997). See generally *id.* at § 12:1 (examining kinds of agreements usually considered void).

■ We can safely rule out any suggestion that § 207 violations could, alone, have voided the contracts (let alone that JSE could have "known" of the voiding). In *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 81 S.Ct. 294, 5 L.Ed.2d 268 (1961), decided in an era when Supreme Court readiness to infer remedies from criminal statutes was at a high point, the Court found that violations of a predecessor of § 207's statutory neighbor criminalizing certain conflicts of interest, 18 U.S.C. § 208, gave the government the right to "disaffirm a contract which is infected by an illegal conflict of interest." 364 U.S. at 566, 81 S.Ct. 294. There is no suggestion in the opinion that the contract self-destructed into voidness, depriving the government of its election. The decision assumes (without discussion, to be sure) that the government would want to retain the *option* to treat the contract as fully in effect. See *id.* at 563, 81 S.Ct. 294 ("This protection [from corrupting influences] can be fully accorded only if contracts which are tainted by a conflict of interest ... *may* be disaffirmed by the Government." (emphasis added)). Reasons why the government would wish to preserve that election abound: the officials authorized to decide might regard the violation as minor; they might think that the criminal penalties provide ample punishment of the present violation and deter-rence of future ones; they might be concerned that disaffirmance would unduly impede future transactions with the contracting firm (possibly in possession of skills or other resources of exceptional value to the government) or with other potential contractors. Longrun interests often argue against pushing legal rights to the hilt.

We note that the Federal Circuit has said that government contracts "tainted by fraud or wrongdoing" are "void ab initio." In the first such case, *J.E.T.S., Inc. v. United States*, 838 F.2d 1196, 1200 (Fed. Cir.1988), nothing turned on the characterization. In the second, *Godley v. United States*, 5 F.3d 1473, 1476 (Fed.Cir.1993), the consequences were obscure, and the opinion in any event disregarded the language of *Mississippi Valley Generating* that supports voidability and pointed to none supporting voidness. Read for all their worth, these opinions would vastly expand the normally minute group of contracts treated as void.

But the issue is open whether § 207 violations in the securing or execution of a contract might render it voidable. Of course the revolving door at which § 207 is aimed may seem less problematic than the sort of actual conflict of interest at stake in § 208 and in *Mississippi Valley Generating*. And in concluding that the voidability issue was open, the court in *United States v. Medico Indus., Inc.*, 784 F.2d 840 (7th Cir.1986), noted that at the time of *Mississippi Valley Generating* the Court "was freer [than currently] with the creation of additional remedies." *Id.* at 845. But the *Medico* court went on to point out that remedies created in that era had generally survived and that the *Mississippi Valley Generating* viewpoint was the one prevailing at the time of § 207's enactment. *Id.* In the end the Seventh Circuit left the

---

1. Siewick most commonly argues that the contracts at issue here were "unenforceable," a legal status that appears to encompass voidable contracts but is often treated separately. See Restatement (Second) of Contracts § 8 & cmts. a & b; 1 Corbin on Contracts § 1.8. In context, however, his claims are best understood as alleging either voidness or voidability.

issue open because Medico had dropped the issue in the district court. *Id.* at 844–45. We also leave the issue open; its resolution is unnecessary to today's case.

 Whatever the ultimate answer to that question, the obstacles to a conclusion that JSE "knowingly" misrepresented the validity of the contract obligations are legion. First, if the panel in *Medico* was uncertain whether a § 207 violation created voidability, it is hard to see how Jamieson or O'Connor could—with respect even to voidability, let alone validity—have satisfied even the loosest standard of knowledge, i.e., acting "in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(3). While a faulty estimate or opinion can qualify as a false statement where the speaker knows facts "which would *preclude* such an opinion," *Harrison*, 176 F.3d at 792 (emphasis added), the "facts" of which the *Harrison* court spoke are those that the speaking party could reasonably classify as true or false, see *id.* Here there is only legal argumentation and possibility.

 Moreover, a final decision that § 207 violations may allow the government to disaffirm a contract would leave other legal uncertainties. Assuming that O'Connor and Jamieson had some reason to think that § 207 had been violated, and that a contract tainted with such a violation could become voidable, they would also have had to know whether voidability requires materiality, i.e., whether the § 207 violations must have affected the terms of the contracts. In most circumstances, the party seeking to avoid the contract must prove that the defect had a material effect on the transaction in question. See Restatement (Second) of Contracts §§ 7 cmt. b (fraud, mistake, or duress); 15 cmt. b (mental illness); 16 cmt. b (intoxication); but see *id.* § 7 cmt b (materiality presumed when one party is an infant).

Second, even assuming that JSE's contracts were voidable, invalidity is a distinct issue. Siewick's theory is concededly and necessarily that JSE knew that the contracts were invalid. But even if voidable they would have become invalid only on a contingency—the contingency that the government would exercise the assumed right to disclaim.

Third, a court that found contracts invalid in a *qui tam* action where the government has not joined the plaintiff would have unilaterally divested the government of the opportunity to exercise precisely the discretion that is among the key differentiations of voidness from voidability: the discretion to accept or disaffirm the contract on the basis of complex variables reflecting the officials' views of the government's longterm interests.

The implications of Siewick's position are extraordinary. Disputes arise between the government and its contractors every day. Contractors do not win every penny they claim. On Siewick's theory, any contracting party that misunderstands its legal entitlements and therefore fails to recover on an invoice in full would be liable under the False Claims Act—except in instances where it was unaware of the facts that led to its failure to recover in full. This is not a prescription for fair or efficient contracting.

Accordingly, we find a want of evidence from which a jury could reasonably infer that JSE knowingly asserted a falsity in its claims for payment under the contracts.

The district court's grant of partial summary judgment is

*Affirmed.*