Karen CRANE–McNAB, Bert Crane, and Mary Crane Couchman, individuals, Karen Crane–McNab, LLC; Bert Crane Orchards, L.P.; Mary Crane Couchman Trust; and Mary Crane Couchman Family Partnership, L.P., Plaintiffs,

v.

COUNTY OF MERCED, and Does 1 to 20, Defendants.

No. CIV. 1:08–1218 WBS SMS.

United States District Court, E.D. California.

Feb. 8, 2011.

Opinion Denying Motion to Amend April 28, 2011.

Justin Thomas Campagne, Campagne, Campagne, & Lerner, A Prof. Corp., Fresno, CA, for Plaintiffs.

James Ethan Stone, Robert D. Gabriele, James Nathan Fincher, Roger S. Matzkind, Merced, CA, for Defendants.

## MEMORANDUM OF DECISION

WILLIAM B. SHUBB, District Judge.

This action involves land owned by plaintiffs,[1] which they allege has been contaminated by a neighboring landfill operated by the Merced County ("County"). The court held a four-day bench trial, lasting from January 24, 2011, to January 27, 2011. This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

### I. Factual and Procedural History

Plaintiffs own approximately 4500 acres of land ("Crane property") in Merced County to the west of Highway 59. Highway 59 is part of a Caltrans right of way that is approximately 120 to 150 feet wide. To the east of the right of way is a landfill owned by the Merced County Regional Waste Management Authority[2] and operated by the County. Most of plaintiffs' claims relate to six lots directly to the west of Highway 59 that are allegedly affected by the landfill.[3] Other claims relate to portions of the Crane property further to the west, surrounding Canal Creek and Edendale Creek.[4] Cattle grazing is the highest and best use of the Crane property. Permanent crops or buildings are not permitted on most, if not all, of the landfill-related lots. For the past five or six years, 3300 acres of the Crane property have been rented to John McGill for $28 per acre annually for cattle grazing.

The landfill has been in operation since 1973, and consists of three waste disposal areas. Phases 1 through 4, which opened in 1973 and are unlined, are on the southeastern edge of the landfill and are approximately 500 feet from the Crane property at the closest point. Phase 5, which is

---

1. Karen Crane–McNab, Bert Crane, and Mary Crane Couchman have been dismissed from the state law causes of action. (Order on Defs.' Partial Mot. to Dismiss Third Am. Compl. (Docket No. 53).)

2. The Authority is made up of Merced County and the cities of Los Banos, Atwater, Livingston, Dos Palos, and Gustine.

3. Per the Order on Defendant's Summary Judgment Motion (Docket No. 153) dated November 13, 2010, plaintiffs' claims regarding volatile organic compound ("VOC") migration are only recoverable as to Lot 1, a 150-acre parcel on the southern end of the landfill-related properties, owned by Karen Crane–McNab, LLC.

4. The parcels at issue for the claims involving the Highway 59 landfill are: Lot 1, APN: 052–150–013; Lot 2, APN: 052–150–012; Lot 3, APN: 052–150–010; Lot 17, APN: 052–150–009; Lot 18, APN: 052–150–011; Lot 59, APN: 052–070–013; and Lot 60, APN: 052–070–011. The parcels at issue for the claims involving Edendale and Canal Creeks are: Lot 23, APN 052–080–008; Lot 24, APN 052–080–007; Lot 25, APN 052–080–006; Lot 26, APN 052–080–015; Lot 27, APN 052–080–014; Lot 28, APN 052–080–013; Lot 29, APN 052–080–012; Lot 30, APN 052–050–030; Lot 30, APN 052–080–011; Lot 31, APN 052–080–009; Lot 39, APN 052–040–080; Lot 39, APN 052–090–036; Lot 40, APN 052–040–084; Lot 40, APN 052–090–037; Lot 43, APN 052–040–078; Lot 44, APN 052–050–031; Lot 44, APN 052–040–079; Lot 48, APN 052–050–026; Lot 47, APN 052–050–027; Lot 47, APN 052–080–016; Lot 48, APN 052–050–026; Lot 49, APN 052–050–025; Lot 50, APN 052–050–032; Lot 51, APN 052–050–024; Lot 52, APN 052–050–023; Lot 53, APN 052–050–022; Lot 55, APN 052–050–021; Lot 56, APN 052–050–033; Lot 56, APN 052–080–019; Lot 57, APN 052–080–020; Lot 57, APN 052–050–034; Lot 58, APN 052–060–015; Lot 58, APN 052–080–021; Lot 58, APN 052–070–012; and Lot 58, APN 052–050–035. The individual lots at issue are each owned by one of the plaintiffs, rather than collectively or jointly.

newer and lined with a plastic barrier, is on the southwestern edge and is approximately 250 feet from the Crane property at the closest point. To the north of those phases is a mitigation area currently used for cattle grazing; above the mitigation area is Phase 6, which is not yet operational.

The County also operates two creeks that run through the Cranes' property and then into Castle Dam: Canal Creek and Edendale Creek ("the creeks").[5] In 1993, the United States took certain land in easements by fee in order to build Castle Dam and Reservoir Unit. This included a flood easement on the Crane property to account for any future flooding caused by the Dam, for which they were compensated. Plaintiffs are required to apply for a permit before planting any crops on the creek-related lots.

Plaintiffs' complaint can be separated into four distinct allegations: (1) volatile organic compounds ("VOCs") have migrated through the soil from the landfill onto Lot 1; (2) trash and odors are blown onto the Crane property from the landfill by the wind; (3) runoff water from the landfill floods Lot 1; and (4) debris from the creeks accumulates on the Crane property.

After a partial grant of summary judgment in this case on several issues of fact and law (Docket No. 153), seven claims remain: (1) inverse condemnation under federal and state law regarding VOC migration, trash, and creek debris; (2) trespass regarding VOC migration; (3) nuisance regarding VOC migration, trash, and odors; (4) negligence regarding VOC migration; (5) negligent failure to warn regarding VOC migration; (6) violation of the Due Process Clause of the Fourteenth Amendment; and (7) declaratory relief.

## II. Discussion

■ Under the California Constitution article I, section 19, property may not be taken or damaged for public use without just compensation to the owner. Inverse condemnation is a constitutional remedy permitting recovery of consequential damages arising from public projects. Foreseeability is not required, *Albers v. Cnty. of L.A.*, 62 Cal.2d 250, 263–264, 42 Cal.Rptr. 89, 398 P.2d 129 (1965), and tort concepts like fault or negligence are not applicable. *Bunch v. Coachella Valley Water Dist.*, 15 Cal.4th 432, 436, 63 Cal. Rptr.2d 89, 935 P.2d 796 (1997). Instead, the government is strictly liable for any physical injury to property substantially caused by a public improvement as it was deliberately designed and constructed. *Bunch*, 15 Cal.4th at 440, 63 Cal.Rptr.2d 89, 935 P.2d 796; *Pac. Bell v. City of San Diego*, 81 Cal.App.4th 596, 602, 96 Cal. Rptr.2d 897 (4th Dist.2000); *Marshall v. Dep't of Water & Power*, 219 Cal.App.3d 1124, 1139, 268 Cal.Rptr. 559 (2d Dist. 1990) ("[A] governmental entity may be held strictly liable, irrespective of fault, where a public improvement constitutes a substantial cause of the plaintiff's damages even if only one of several concurrent causes.").

■ To establish liability for inverse condemnation under the *Albers* standard, plaintiffs must establish, by a preponderance of the evidence, four elements: "First, that [they] ha[ve] an interest in real or personal property; Second, the [County] substantially participated in the planning, approval, construction or operation of a public project or public improvement; Third, [plaintiffs'] property suffered damage; and Fourth, the [County's] project, act or omission was a substantial cause of

---

**5.** The County "operates and maintains" the creeks (Pretrial Order at F. ¶ 6), which are owned in fee by the Merced Irrigation District. (*Id.* at F. ¶ 94.)

the damage." *Yamagiwa v. City of Half Moon Bay,* 523 F.Supp.2d 1036, 1088 (N.D.Cal.2007) (emphasis omitted).

■ Similarly, the Fifth Amendment of the United States Constitution provides in relevant part that "private property [shall not] be taken for public use, without just compensation." The Takings Clause is applicable to the states through the Fourteenth Amendment.[6] *Dolan v. City of Tigard,* 512 U.S. 374, 383, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994). Physical possession of the property is not a necessary element of a takings claim. "A taking can occur simply when the Government by its action deprives the owner of all or most of his interest in his property ... it is the loss to the owner of the property and not the accretion to the Government which is controlling in fifth amendment cases." *Aris Gloves, Inc. v. United States,* 190 Ct.Cl. 367, 420 F.2d 1386, 1391 (1970).

■ To establish a claim for trespass, plaintiffs must plead and prove, by a preponderance of the evidence, the following: (1) plaintiffs owned the property; (2) the County intentionally, recklessly, or negligently entered plaintiffs' property or caused the contaminants or debris to enter plaintiffs' property; (3) plaintiffs did not give the County permission for the entry; (4) plaintiffs were harmed; and (5) the County's conduct was a substantial factor in causing that harm. *See Vega v. JPMorgan Chase Bank, N.A.,* 654 F.Supp.2d 1104, 1119 (E.D.Cal.2009). "A trespass may be on the surface of the land, above it, or below it. The migration of pollutants from one property to another may constitute a trespass ...." *Martin Marietta Corp. v. Ins. Co. of N. Am.,* 40 Cal.App.4th 1113, 1132, 47 Cal.Rptr.2d 670 (2d Dist. 1995) (internal citation omitted).

■ California Civil Code section 3479 defines a nuisance as "[a]nything which is injurious to health ... or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ...." Cal. Civ.Code § 3479. "The statutory definition of nuisance appears to be broad enough to encompass almost any conceivable type of interference with the enjoyment or use of land or property." *Stoiber v. Honeychuck,* 101 Cal.App.3d 903, 919, 162 Cal.Rptr. 194 (5th Dist.1980). "The migration of pollutants from one property to another may constitute ... a nuisance ...." *Marietta,* 40 Cal.App.4th at 1132, 47 Cal.Rptr.2d 670.

■ In their negligence claim, plaintiffs allege negligence per se for various violations of California law, and also argue that res ipsa loquitur applies. A presumption of negligence arises if: (1) the defendant violated a statute; (2) the violation proximately caused the plaintiff's injury; (3) the injury resulted from the kind of occurrence the statute was designed to prevent; and (4) the plaintiff was one of the class of persons the statute was intended to protect. *Quiroz v. Seventh Ave. Ctr.,* 140 Cal.App.4th 1256, 1285, 45 Cal.Rptr.3d 222 (6th Dist.2006). Plaintiffs argue that the County is negligent per se based on its violations of (1) California Civil Code section 3479 (nuisance); (2) California Health and Safety Code sections 25189(c) and (d) (intentional and negligent disposal of hazardous waste in an unauthorized manner); (3) California Health and Safety Code section 25359.4 (release of a reportable quantity of hazardous substances without reporting said release); (4) California Health and Safety Code section 25359.5 (obligation to secure site of hazardous sub-

6. Plaintiffs' "due process" claim under the Fourteenth Amendment appears to be duplicative of their takings claim.

stance release); (5) California Civil Code section 851 (obligation to notify potentially responsible parties of release).

■ "In order to invoke res ipsa loquitur, the plaintiff has the burden to establish three conditions: '(1) the event must be of a kind which ordinarily does not occur in the absence of someone's negligence; (2) it must be caused by an agency or instrumentality within the exclusive control of the defendant; (3) it must not have been due to any voluntary action or contribution on the part of the plaintiff.' " *Howe v. Seven Forty Two Co.,* 189 Cal. App.4th 1155, 1161, 117 Cal.Rptr.3d 126 (2d Dist.2010) (quoting Prosser, Law of Torts § 39, at 214 (4th ed. 1971)).

Plaintiffs' claim for negligent failure to warn is brought under California Health and Safety Code section 25359.5 and California Civil Code section 851, described above.

■ Finally, declaratory relief is appropriate when the facts alleged "show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of declaratory judgment." *Boeing Co. v. Cascade Corp.,* 207 F.3d 1177, 1192 (9th Cir.2000) (quoting *Wickland Oil Terminals v. Asarco, Inc.,* 792 F.2d 887, 893 (9th Cir.1986) (internal quotation mark omitted)).

A. *VOC Migration*

Plaintiffs' claims for inverse condemnation, trespass, nuisance, negligence, and failure to warn are based in whole or in part on the allegation that VOCs migrated from the landfill onto Lot 1 of the Crane property. Timothy Souther of AMEC Geomatrix, an environmental consulting firm, testified regarding the migration, explaining that several VOCs were found in the soil on Lot 1. Plaintiffs argue that the VOCs found in Lot 1 must have migrated from the landfill because the landfill contains VOCs and migration of VOCs is known to have occurred to the north and south of the landfill.

■ The court finds that plaintiffs' theory is unconvincing for several reasons. First, while plaintiffs presented evidence that VOCs were found in Lot 1, their testing techniques were severely flawed, making their data questionable. Second, the VOCs found in Lot 1 were not identical in kind or quantity to those found in the landfill. Third, the reasons migration occurred to the north and south did not apply to the western border. Finally, the VOCs present in Lot 1 could have come from sources other than the landfill.

Defense expert E. Wayne Pearce, a geologist for SCS Engineers, testified at length regarding the problems with the testing performed in Lot 1. He concluded that the tests performed by plaintiffs were "indefensible" and could not be relied upon. His testimony on the subject was unimpeached. First, plaintiffs should have tested for methane and carbon dioxide, which normally travel with other landfill gases, but they failed to do so. Not only does this indicate a lack of experience on the part of plaintiffs' experts in performing such tests, but it also makes it difficult to ascertain whether the VOCs came from the landfill or from another source. Second, to take the sample, plaintiffs used an older section of PVC pipe that had been glued together. Solvents and glues contain large quantities of VOCs, which would contaminate the sample taken through the pipe. A related problem is that plaintiffs did not conduct a "blank" test to determine whether the equipment used affected the results. Third, testing usually includes a duplicate sample drawn at the same time and from the same location, which the laboratory analyzes independently without knowing its origin, as a way to verify the laboratory results. This

quality control measure was performed with samples taken at different times, and the two results were significantly different. Fourth, plaintiffs took an ambient air sample but failed to document the wind direction present at the time, making that reading useless. Fifth, the location at which the sample was taken could only provide information for a small area of influence, approximately fifty to one hundred feet. Defense expert Paul Damian, a risk assessor for SCS Engineers, testified that for purposes of risk assessment he would at a minimum use ten sampling sites to ensure accurate data for the area. Because VOCs are detected in parts per billion, testing must be particularly careful in order to avoid false positives or inaccurate readings. Since plaintiffs' testing did not follow the procedures necessary to ensure accurate readings, their data is not credible.

Patrick Sullivan of SCS Engineers testified that not only were plaintiffs' testing techniques unreliable but also that the data did not show that VOCs migrated from the landfill. The court finds Mr. Sullivan to be a credible witness and well-qualified to testify as an expert on this subject. According to Mr. Sullivan, there was no "fingerprint match" between the chemicals found in the landfill and those found in Lot 1. (*See* Def. Trial Ex. 1003 (showing the chemicals found in the landfill and in Lot 1).) This makes it much less likely that the chemicals in Lot 1 came from the landfill. Migration from a landfill would almost certainly contain methane, carbon dioxide, and freons. Freons were found in the landfill but not in Lot 1, and plaintiffs failed to test for methane and carbon dioxide. Furthermore, some of the chemicals detected in Lot 1 were actually found in higher quantities than those detected in the landfill, indicating that they could not have come entirely from the landfill. Some of the Lot 1 chemicals were not even detected in the landfill.

Furthermore, migration to the west does not logically follow simply because migration occurred to the north and south. A large plastic-lined cell, Phase 5, sits between the unlined cells and the Crane property, whereas there is no physical barrier between the unlined cells and the property to the north and south. The unlined cells are also older, and contain chemicals that are no longer permitted in modern landfills. In addition to the differences between the western border and the northern and southern borders, testimony showed that the way in which chemicals move through soil is variable and slow, and depends in large part on the soil material. Movement is not uniform in every direction. Thus, it is possible that VOC migration occurred to the north and south of the landfill without necessarily occurring to the west.

The chemicals in Lot 1 could have come from any number of sources. Mr. Sullivan testified that many of the chemicals present in Lot 1 are found in petroleum, which could just as easily have come from the highway or from vehicles driving on the Crane property. The amount found in the soil could have been caused by less than a gallon of petroleum. For the foregoing reasons, plaintiffs have not shown by a preponderance of the evidence that the chemicals found in the soil of Lot 1, if they existed at all, came from the landfill.

Because plaintiffs have failed to show that VOCs migrated from the landfill to Lot 1, they cannot succeed on their VOC-related claims. Plaintiffs' claim that VOC migration constitutes inverse condemnation fails because they have not shown any injury to their property caused by the County under either the Fifth Amendment to the United States Constitution or the California Constitution article I, section 19. *See Aris Gloves,* 420 F.2d at 1391 (government must have deprived

owner of interest in property under United States Constitution); *Yamagiwa*, 523 F.Supp.2d at 1088 (plaintiffs must prove that property suffered damage under California Constitution). Similarly, plaintiffs failed to show that the County intentionally, recklessly, or negligently caused any contaminants to enter the property, and thus they cannot recover for trespass. *See Vega*, 654 F.Supp.2d at 1119. By failing to show that VOCs from the landfill "interfere[d] with" their property, plaintiffs also cannot recover under a theory of nuisance. *See* Cal. Civ.Code § 3479.

■ As to their various theories of negligence, plaintiffs have failed to prove the necessary elements by a preponderance of the evidence. The County is alleged to have been negligent per se based on its violations of California Civil Code section 3479 for nuisance, California Health and Safety Code sections 25189(c) and (d) for negligently or intentionally disposing of hazardous waste in an unauthorized manner, California Health and Safety Code section 25359.4 for release of a reportable quantity of hazardous substances without reporting said release, California Health and Safety Code section 25359.5 for failure to secure the site of a hazardous substance release, and California Civil Code section 851 for failure to notify potentially responsible parties of a release.

Plaintiffs' claim for nuisance has already been shown to have failed, and the other statutes all involve the disposal or release of hazardous substances. Defense witness Ambrose McCready, a project manager for SCS Engineers, was unimpeached in his testimony that the landfill met all standards of care for the state of California; plaintiffs have not demonstrated that any waste was disposed of in an unauthorized manner, much less negligently or intentionally. Nor have plaintiffs presented any evidence that the County knew that it was releasing a reportable quantity of hazardous substances or that the County *did* release such substances. No presumption of negligence can arise from the County's actions, and res ipsa loquitur does not apply because no "event" has been shown to have happened that could be the basis for a finding of negligence.

■ Finally, plaintiffs' claim for failure to warn is based on two of the same statutes, California Health and Safety Code section 25359.5 and California Civil Code section 851, which the court found were not violated with regards to negligence per se. The County cannot be required to warn of a release of hazardous substances that has not been proven to have occurred. Because they have failed to demonstrate the underlying fact of VOC migration on which their claims rely, plaintiffs cannot recover on any of their VOC-related claims.[7]

7. Because the court finds that plaintiffs have not met their burden of showing that VOCs migrated from the landfill to Lot 1, it is unnecessary to reach plaintiffs' argument that the property value of their land has diminished to zero by virtue of the expense of hazardous waste cleanup that would be required under the Comprehensive Environmental Response, Compensation, and Liability Act (CERCLA), 42 U.S.C. §§ 9601–9675. Even if the court found that chemicals did exist in Lot 1, plaintiffs have not shown that cleanup would be necessary. While there is no minimum quantity or concentration of a substance required to trigger CERCLA cleanup, *A & W Smelter & Refiners, Inc. v. Clinton*, 146 F.3d 1107, 1110–11 (9th Cir.1998), "the EPA may issue an order under [42 U.S.C.] section 9606(a) only if it determines there is 'an imminent and substantial endangerment to the public health or welfare or the environment.'" *Id.* at 1113 (quoting 42 U.S.C. § 9606(a)). Furthermore, individual liability under CERCLA exists only when cleanup is "necessary," 42 U.S.C. § 9607(a)(4)(B), which requires that "an actual or real threat to human health or the environment exist before initiating a response action." *Carson Harbor Village, Ltd. v. Unocal Corp.*, 270 F.3d 863, 871 (9th Cir.2001). Plaintiffs presented no evidence that any VOCs in Lot 1 presented a risk to human health or the environment;

## B. Trash and Odors

Plaintiffs' claims for inverse condemnation and nuisance depend in part on their allegation that trash has blown onto their property from the landfill, and their claim for nuisance also depends in part on the allegation that odors came over from the landfill. Plaintiffs' witnesses Bert Crane and John McGill testified that trash blew over from the landfill and onto the Crane property. They also testified that a strong odor came from the landfill. Based on the testimony, the court finds it more likely than not that trash from the landfill blew onto the Crane property and that the odor of the landfill is present on the Crane property.

 While plaintiffs have demonstrated that trash and odors came from the landfill onto their property, they failed to provide the court with any evidence concerning damages. The property's highest and best use is cattle grazing, and the court heard no evidence that trash or odors could prevent cattle grazing or even any other use of the property. While Mr. McGill testified that two of his cows died as a result of eating trash blown over from the landfill, he did not indicate that he would stop renting the property or attempt to negotiate for a lower rent payment as a result. Plaintiffs must demonstrate their own damages, not someone else's damages. There is a total lack of any evidence that trash or odors "interfere[d] with the enjoyment or use of land or property," *Stoiber*, 101 Cal.App.3d at 919, 162 Cal.Rptr. 194, and cannot recover on their claim for nuisance regarding the trash or odors. Constitutional damages to property in inverse condemnation cases are damages "depreciating its market value." *Albers*, 62 Cal.2d at 260, 42 Cal.Rptr. 89, 398 P.2d 129. While plaintiffs' witness

Jeffrey Lien testified, albeit unconvincingly, that VOCs in the soil brought the property value to zero, no evidence was presented that trash would affect the property value. If plaintiffs believed that the trash affected the property value, they could have asked Mr. Lien or another witness to testify as to that fact, but they did not. Thus, plaintiffs cannot recover on their inverse condemnation claim regarding trash.

## C. Flooding

Plaintiffs raised a new theory of liability at trial, when Bert Crane testified that water from the landfill comes through a culvert under Highway 59 and floods a large portion of Lot 1. However, defense witnesses Rod Andrews, the Solid Waste Division Manager for the Merced County Department of Public Works, and Randolph Bardini, an engineer for the County, testified that only a small portion of the landfill actually drains into the culvert in question, and that there is actually less drainage into that culvert than there was before the landfill expanded in 2008. Much of the water coming through the culvert actually originated on the Crane property or other non-landfill property. Furthermore, plaintiffs introduced no pictures of the alleged flooding, and other pictures of Lot 1 show the land in a non-flooded state. (*See, e.g.*, Joint Trial Ex. 168.) Plaintiffs have not demonstrated by a preponderance of the evidence that the landfill floods the Crane property, and therefore they cannot recover under any theory of liability for such flooding.

## D. Creeks

Plaintiffs' claim for inverse condemnation depends in part on their allegation

indeed, defense expert Paul Damian's testimony stating that there was no risk was uncontested.

that creeks maintained by the County and flowing through the Crane property leave debris such as branches and tires when the creeks rise and then subside. The court heard testimony from Bert Crane that over the years several tree branches from cottonwood and willow trees and at most seven tires have been deposited on the Crane property as a result of creek flooding.

■ Plaintiffs' evidence regarding debris was uncontested and the court finds that plaintiffs have demonstrated that branches and on occasion tires are indeed deposited on the banks of the creeks. However, as with the trash and odors from the landfill, plaintiffs have not demonstrated any damages resulting from the debris, and thus they cannot succeed on a claim for inverse condemnation. *See Yamagiwa,* 523 F.Supp.2d at 1088 (plaintiffs must prove that property suffered damage); *Albers,* 62 Cal.2d at 260, 42 Cal.Rptr. 89, 398 P.2d 129 (damages depreciating the property's market value are cognizable). As with the allegations regarding trash, Mr. Lien, the appraiser, could have testified as to how the property value was affected by the creek debris, but he did not.

The Merced Irrigation District owns the creeks, and the County is responsible for maintaining them. The court finds no reason to believe that debris in a creek is anything but normal. In fact, defense witness Kellie Jacobs, an administrative engineer for public works for the County, testified that the creek is supposed to contain some branches, giving birds a place to perch in the creek. Plaintiffs have not demonstrated that debris from a creek that washes up on the banks is in any way harmful to the property value or that the County somehow effected a taking by failing to remove debris.

Since plaintiffs have not demonstrated that the debris from the creeks depreciates the market value of the property, they cannot recover on a claim for inverse condemnation.

IT IS THEREFORE ORDERED that plaintiffs take nothing on their claims and that judgment be entered in favor of defendant County of Merced and against the plaintiffs in this action.

The Clerk of the Court is directed to enter judgment accordingly.

## *MEMORANDUM AND ORDER RE: MOTIONS TO AMEND FINDINGS, FOR NEW TRIAL OR TO ALTER OR AMEND JUDGMENT, FOR RELIEF FROM JUDGMENT, FOR ATTORNEY'S FEES, AND FOR SANCTIONS*

On February 8, 2011, this court entered judgment in favor of defendant after a four-day bench trial. (Docket No. 193.) Plaintiffs now move the court to amend its findings or make additional findings pursuant to Federal Rule of Civil Procedure 52(b), for a new trial or to alter or amend the judgment pursuant to Rule 59, and for relief from judgment due to mistake or inadvertence pursuant to Rule 60. Defendant also moves the court to amend or clarify its findings pursuant to Rule 52(b) and moves for attorney's fees pursuant to 42 U.S.C. § 1988 and sanctions pursuant to Rule 11.

### I. *Factual and Procedural Background*

This action arises out of a landfill operated by defendant that neighbors plaintiffs' land. A Caltrans right of way, which includes Highway 59, runs between the landfill and the Crane property. Plaintiffs alleged that volatile organic compounds ("VOCs") migrated from the landfill onto their property, trash and odor blew from the landfill onto their property, water came through a culvert in the Caltrans right of way onto their property, and debris from creeks allegedly maintained by

defendant collected on their property. After a partial grant of summary judgment on several issues of law and fact (Docket No. 153), the court held, following a bench trial, that plaintiffs had failed to prove by a preponderance of the evidence any of their claims, which included (1) inverse condemnation under federal and state law regarding VOC migration, trash, and creek debris; (2) trespass regarding VOC migration; (3) nuisance regarding VOC migration, trash, and odors; (4) negligence regarding VOC migration; (5) negligent failure to warn regarding VOC migration; (6) violation of the Due Process Clause of the Fourteenth Amendment; and (7) declaratory relief. (Feb. 8, 2011, Mem. of Decision (Docket No. 192).)

Plaintiffs have appealed to the United States Court of Appeals for the Ninth Circuit from the judgment on March 7, 2011. (Docket No. 200.) Federal Rule of Appellate Procedure 4 provides:

> If a party files a notice of appeal after the court announces or enters a judgment-but before it disposes of any motion listed in Rule 4(a)(4)(A) [including a motion to amend or make additional factual findings under Rule 52(b), to alter or amend the judgment under Rule 59, for a new trial under Rule 59, or for relief under Rule 60]-the notice becomes effective to appeal a judgment or order, in whole or in part, when the order disposing of the last such remaining motion is entered.

Fed. R.App. P. 4(a)(4). Thus, this court retains jurisdiction to decide the Rule 52(b), 59, and 60 motions despite plaintiffs' appeal.

Similarly, this court retains jurisdiction over defendant's motions for attorney's fees and sanctions. *See United Energy Owners Comm., Inc. v. U.S. Energy* *Mgmt. Sys., Inc.,* 837 F.2d 356, 358 (9th Cir.1988) (district court retained jurisdiction to impose sanctions while appeal was pending); *Masalosalo by Masalosalo v. Stonewall Ins. Co.,* 718 F.2d 955, 957 (9th Cir.1983) (district court retained jurisdiction to award attorney's fees after notice of appeal from decision on merits was filed).

## II. Discussion

### A. Rules 52(b), 59, and 60

Federal Rule of Civil Procedure 52(b) permits a court to amend findings made after a bench trial. Rule 52(b) provides: "On a party's motion filed no later than 28 days after the entry of judgment, the court may amend its findings—or make additional findings—and may amend the judgment accordingly." Fed.R.Civ.P. 52(b). Motions under Rule 52(b) are primarily designed to correct findings of fact which are central to the ultimate decision; the Rule is not intended to serve as a vehicle for a rehearing. *Davis v. Mathews,* 450 F.Supp. 308, 318 (E.D.Cal.1978).

Rule 59(a) of the Federal Rules of Civil Procedure provides that a court may grant a new trial "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court."[1] Fed. R.Civ.P. 59(a)(1)(B). After a nonjury trial, a court may also "open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Fed.R.Civ.P. 59(a)(2). Rule 59 does not specify the grounds on which a motion for a new trial may be granted. *Zhang v. Am. Gem Seafoods, Inc.,* 339 F.3d 1020, 1035 (9th Cir. 2003). Rather, the court is "bound by

---

1. Plaintiffs do not explain why they move for a new trial or the grounds on which the court could grant a new trial. Accordingly, the court need not dignify the motion with any discussion or explanation, other than to deny it as groundless.

those grounds that have been historically recognized." *Id.*

Rule 59(e) provides that a court may alter or amend a judgment. Absent "other, highly unusual, circumstances," reconsideration pursuant to Rule 59(e) is appropriate only where (1) the court is presented with newly discovered evidence; (2) the court committed clear error or the initial decision was manifestly unjust; or (3) there is an intervening change in controlling law. *Sch. Dist. No. 1J, Multnomah Cnty. v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir.1993).

Federal Rule of Civil Procedure 60(a) allows the court to correct, on its own initiative or on the motion of any party, a clerical mistake in a judgment, order, or other part of the record. A court may amend its decision under Rule 60(a) so long as the change is consistent with the court's original intent. *Harman v. Harper,* 7 F.3d 1455, 1457 (9th Cir.1993). "The basic distinction between 'clerical mistakes' and mistakes that cannot be corrected pursuant to Rule 60(a) is that the former consist of 'blunders in execution' whereas the latter consist of instances where the court *changes its mind ....*" *Blanton v. Anzalone,* 813 F.2d 1574, 1577 n. 2 (9th Cir.1987) (quoting *United States v. Griffin,* 782 F.2d 1393, 1396–97 (7th Cir.1986)). Rule 60(a) may not be used to correct substantial errors, such as errors of law. *Sanchez v. City of Santa Ana,* 936 F.2d 1027, 1033 (9th Cir.1990).

Rule 60(b) allows a court to relieve a party from a final judgment, order, or proceeding for six reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence; (3) fraud, misrepresentation, or other misconduct by the opposing party; (4) the judgment is void; (5) the judgment has been satisfied, released, or discharged; and (6) any other reason justifying relief. Fed. R.Civ.P. 60(b). Mere dissatisfaction with the court's order, or belief that the court is wrong in its decision, are not grounds for relief under Rule 60(b). *Twentieth Century–Fox Film Corp. v. Dunnahoo,* 637 F.2d 1338, 1341 (9th Cir.1981).

Plaintiffs request thirteen amendments to the court's findings of fact and also ask the court to amend the judgment to award plaintiffs nominal damages, injunctive relief, and declaratory relief. Plaintiffs do not specify the rules under which they make these requests, but refer generally to Rules 52(b), 59, and 60. Defendant also requests one amendment to the findings of fact pursuant to Rule 52(b).

### 1. *Findings of Fact*

Plaintiffs request several amendments to the findings of fact that would simply add more background to the court's memorandum of decision without being central to the decision or affecting the judgment. Plaintiffs' proposed amendments include: (1) the dates the government tort claim and the instant suit were filed, (2) a description of the mitigation measures considered by the County, (3) the disclosure requirements for sellers of contaminated real estate, (4) a more complete description of the testimony by plaintiffs' appraiser, Jeffrey Lien, and a further explanation of why the court did not consider his testimony to be credible, (5) the fact that the County issued a request for proposals for a new gas extraction system, (6) the fact that the County then issued a second request for proposals, (7) the fact that the County asked at trial that the court treat extraction as a subsequent remedial measure, (8) an explanation of the conflict in current scientific knowledge regarding whether methane separates from VOCs, and (9) an explanation of the County's argument that Freon must be present when VOC migration occurs. The addition of the proposed amendments would not

change the court's opinion, and the court declines to amend its decision simply to articulate the facts in a way that would be pleasing to plaintiffs.

Plaintiffs and defendant each move for one correction to language in the court's decision that they believe to be incorrect. Plaintiffs believe that the court's description of the location of the various landfill cells was inaccurate. However, the court's description was based on the evidence presented at trial, and the court does not find it to be inaccurate. Defendant requests that the court amend its findings regarding the ownership and operation of the creeks. The court finds that its language was accurate based on the evidence presented and declines to amend its findings on this point.[2]

Finally, plaintiffs request that the court find the following facts: (1) the landfill contains many of the same chemicals as those detected on the Crane property, (2) not all VOCs found on the Crane property came from fuel, and (3) there was no evidence of a fuel spill on the Crane property. If plaintiffs would read the court's decision carefully, they would discover that the court in fact discussed these three issues. (See Feb. 8, 2011, Mem. of Decision at 10:18–11:7 (while many of the same chemicals were detected, there was no "fingerprint match"), 11:22–27 (*many* of the chemicals are found in petroleum, and "the amount found in the soil could have been caused by less than a gallon of petroleum," consistent with vehicles on the highway or the property, not necessarily a fuel spill).)

The court need not address every evidentiary issue or fact in its memorandum of decision. *See Nicholson v. Bd. of Educ. Torrance Unified Sch. Dist.*, 682 F.2d 858, 866 (9th Cir.1982) ("The test in this circuit as to the adequacy of findings of fact is whether they are explicit enough on the ultimate issues to give the appellate court a clear understanding of the basis of the decision and to enable it to determine the grounds on which the trial court reached its decision."); *Westside Prop. Owners v. Schlesinger*, 597 F.2d 1214, 1216 n. 3 (9th Cir.1979) ("We do not believe that the district court has an obligation to address explicitly every point raised by the parties.").

It is for the court, not the parties, to prepare its decision, in the language chosen by the court, not the parties. And it is not for the parties to rewrite the court's decision to suit their preferences. *See Delia v. City of Rialto*, 621 F.3d 1069, 1073 n. 2 (9th Cir.2010) (citing cases disapproving of the practice of courts mechanically adopting the findings of fact and conclusions of law as prepared by counsel); *Indus. Bldg. Materials, Inc. v. Interchem. Corp.*, 437 F.2d 1336, 1339 (9th Cir.1970) ("This practice has been condemned because of the possibility that such findings

---

2. The Memorandum of Decision states that "[t]he Merced Irrigation District owns the creeks, and the County is responsible for maintaining them." (Feb. 8, 2011, Mem. of Decision at 17:7–8 (Docket No. 192).) This reflects the **undisputed fact,** expressly agreed upon by the parties, that was "deemed proven without further proceedings," as stated in the court's Pretrial Order: "Defendant operates and maintains waterways commonly known as Canal Creek and Edendale Creek, which flow through or border property owned by Plaintiffs." (Nov. 18, 2010, Pretrial Order ¶ 6 (Docket No. 162).)

Defendant admits in its reply brief that "the Operations and Maintenance Manual from the Corps of Engineers assigned to the County the task of maintaining the flow of Canal Creek. This duty was owed to the Corps and also mentioned contracting with Merced Irrigation District ("MID") certain portions of the flow maintenance." (Def.'s Mem. of P. & A. in Reply to Pls.' Opp'n to Mot. to Amend/Clarify the Findings at 2:7–10 (Docket No. 220).) Nothing in the court's opinion contradicts this explanation.

and conclusions, prepared by the non-objective advocate, may not fully and accurately reflect the thoughts entertained by the impartial judge at the time of his initial decision."). The court is satisfied that the decision as written is the appropriate expression of its reasoning. The court gave much thought to its opinion, and while the parties may have written the decision differently, for better or worse, the court will deny the parties' motions to the extent that they seek amendments to the findings of fact.

### 2. Nominal Damages and Injunctive Relief

Plaintiffs seek nominal damages and injunctive relief under theories of liability previously rejected by the court: inverse condemnation for trash and nuisance for trash and odor.[3] They also seek injunctive relief regarding future VOC migration, surface water, trash, odor, and creek debris without reference to any theory of liability at all.

A plaintiff seeking a permanent injunction must satisfy a four-factor test. "A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the

plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.,* 547 U.S. 388, 391, 126 S.Ct. 1837, 164 L.Ed.2d 641 (2006).

The standard for a permanent injunction is essentially the same as for a preliminary injunction, with the exception that the plaintiff must show actual success, rather than a likelihood of success. *See Amoco Prod. Co. v. Village of Gambell,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Since plaintiffs did not succeed on any of their claims, they are not entitled to a permanent injunction. *See Lopez v. Wash. Mut. Bank, F.A.,* No. 1:09–CV–1838 AWI JLT, 2010 WL 1558938, at *9 (E.D.Cal. Apr. 19, 2010) ("Because an injunction is merely a remedy and is not a cause of action, a cause of action must exist before injunctive relief may be granted."). Nevertheless, the court will go through each of plaintiffs' requests in turn.

#### a. Nuisance

Plaintiffs argue that they are entitled to a permanent injunction and nominal damages because two California Penal Code sections and one Merced County Code section create a claim for nuisance per se for trash and odor. This argument was not raised in plaintiffs' trial brief or at trial.[4]

---

**3.** To the extent that plaintiffs seek nominal damages and injunctive relief on their claims for negligence and trespass relating to trash and odor, they cannot recover. The court previously granted summary judgment on those claims; they were not part of the trial and plaintiffs cannot attempt to relitigate them now. (*See* Oct. 13, 2010, Summ. J. Order at 28:2–3 (Docket No. 153).)

**4.** The Merced County Code section was mentioned in plaintiffs' Third Amended Complaint ("TAC"). (TAC ¶ 31 (Docket No. 46).)

The Penal Code sections were mentioned in plaintiffs' First Amended Complaint ("FAC"). (FAC ¶¶ 26–27 (Docket No. 10).) The court

dismissed plaintiffs' trespass claim in the FAC because the Penal Code sections did not "mandate a duty on County to support a tort claim." (Oct. 28, 2008, Order at 7:19–8:1 (Docket No. 28).) Plaintiffs again included the Penal Code sections in their Second Amended Complaint ("SAC"). (SAC ¶¶ 26–27 (Docket No. 30).) However, after defendant moved to strike the references to the Penal Code (Mot. to Strike at 3:7–16 (Docket No. 32)), plaintiffs moved to amend their complaint to correct that and other deficiencies (Mem. in Supp. of Mot. to Amend the Compl. at 2:13–15, 3:1–3 (Docket No. 35)) and filed the TAC without any reference to the Penal Code.

A party may not use Rule 52 to "relitigate old issues, to advance new legal theories, or to secure a rehearing on the merits." *Fontenot v. Mesa Petroleum Co.,* 791 F.2d 1207, 1219 (5th Cir.1986). Similarly, a Rule 59(e) motion "may not be used to raise arguments or present evidence for the first time when they could reasonably have been raised earlier in the litigation." *Kona Enters., Inc. v. Estate of Bishop,* 229 F.3d 877, 890 (9th Cir.2000). Plaintiffs cannot now raise new arguments in an attempt to amend the judgment.

Even if the argument had been properly raised, it would fail. Plaintiffs base their nuisance per se argument on California Penal Code section 374.3 (dumping waste matter on private property without consent is unlawful), section 374.4 (littering is unlawful), and Merced County Code section 9.16.010 ("wilfully or negligently or carelessly" allowing material on one's property to be blown onto the property of another is unlawful). The latter is inapplicable, as the court already found that defendant did not act negligently and met all standards of care for the state of California.[5] (Mem. of Decision at 13:7–18).

"[A] nuisance per se arises when a legislative body with appropriate jurisdiction, in the exercise of the police power, expressly declares a particular object or substance, activity, or circumstance, to be a nuisance." *Beck Dev. Co. v. S. Pac. Transp. Co.,* 44 Cal.App.4th 1160, 1206, 52 Cal.Rptr.2d 518 (3d Dist.1996). "[T]o rephrase the rule, to be considered a nuisance per se the object, substance, activity or circumstance at issue must be expressly declared to be a nuisance by its very existence by some applicable law." *Id.* at 1207, 52 Cal.Rptr.2d 518. "[W]here the law expressly declares something to be a nuisance, then no inquiry beyond its existence need be made ...." *Id.* Even if the dumping and littering laws applied to the landfill, an issue that has not been properly briefed,[6] plaintiffs point to no declaration of any legislative body, nor can the court find any, declaring such violations to be a nuisance. Accordingly, plaintiffs have not shown a nuisance per se. As this and plaintiffs' theories at trial involving nuisance have failed, they cannot support plaintiffs' request for a permanent injunction.

Plaintiffs have also failed to show why they are entitled to nominal damages for nuisance. Under California law, "[n]ominal damages are properly awarded ... [w]here there is no loss or injury to be compensated but where the law still recognizes a technical invasion of a plaintiff's rights or a breach of a defendant's duty ...." *Avina v. Spurlock,* 28 Cal.App.3d 1086, 1088, 105 Cal.Rptr. 198 (5th Dist. 1972); *see* Cal. Civ.Code § 3360 ("When a breach of duty has caused no appreciable detriment to the party affected, he may yet recover nominal damages.").

A nuisance is "[a]nything which is injurious to health ... or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ...." Cal. Civ.Code § 3479. The court found in its decision that there was "a total lack of evidence that trash or odors 'interfere[d] with the enjoyment or use of land or property.'" (Mem. of Decision at 15:9–11 (quoting *Stoiber v. Honeychuck,* 101 Cal.App.3d 903, 919, 162 Cal. Rptr. 194 (5th Dist.1980))). Thus, no nui-

---

**5.** Plaintiffs conveniently omit the mens rea portion of Merced County Code section 9.16.010 in their brief. (Pls.' Mem. in Supp. of FRCP 52(b) Mot., FRCP 59 Mot., and FRCP 60 Mot. at 17:2–5 (Docket No. 199).)

**6.** This is one good reason why new arguments should not be raised in post-trial motions.

sance occurred that could entitle plaintiffs to nominal damages.

### b. *Inverse Condemnation*

The court explained in its memorandum of decision that an inverse condemnation claim under California law requires as one of its elements that plaintiffs' property suffer damage (Order at 5:19 (quoting *Yamagiwa v. City of Half Moon Bay,* 523 F.Supp.2d 1036, 1088 (N.D.Cal.2007))), and a claim under federal law requires that the government "deprives the owner of all or most of his interest in property" (*id.* at 6:3–7 (quoting *Aris Gloves, Inc. v. United States,* 190 Ct.Cl. 367, 420 F.2d 1386, 1391 (1970))). This requirement that plaintiffs show they have been damaged (in order to prove the claim) is different from proving the amount of actual damages sustained (in order to recover that amount). *Cf. Adams v. Paul,* 11 Cal.4th 583, 589, 46 Cal.Rptr.2d 594, 904 P.2d 1205 (1995) ("the *fact* of damage" and "the *amount*" are different considerations for statute of limitations purposes).

Plaintiffs did not demonstrate that the trash blown onto their property rose to the level of a taking under state or federal law. It is undisputed that "[w]ind blows away from the Crane property and towards the solid waste facility the majority of the time, only changing directions with rare storms." (Pretrial Order at 12:24–25 (Docket No. 162).) It may be assumed that most trash blown *onto* the property is soon blown *off* of the property. The issue of a small amount of trash temporarily on plaintiffs' property simply does not fall within any conceivable definition of a taking. *See Yee v. City of Escondido,* 503 U.S. 519, 527, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) ("compelled physical invasion of property"); *Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 435, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) ("permanent physical occupation of another's property"); *id.* at 435–36, 102 S.Ct. 3164 (de-

struction of owner's property rights to possess, use, and dispose of property); *PruneYard Shopping Ctr. v. Robins,* 447 U.S. 74, 82–83, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1980) ("[T]he determination whether a state law unlawfully infringes a landowner's property in violation of the Taking Clause requires an examination of whether the restriction on private property 'forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole.' ... This examination entails inquiry into such factors as the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations." (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960))); *Penn. Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922) ("[I]f regulation goes too far it will be recognized as a taking.").

Under federal law, the award of nominal damages in § 1983 cases is mandatory as "symbolic vindication" of a plaintiff's constitutional rights, whether or not he has suffered economic harm. *Schneider v. Cnty. of San Diego,* 285 F.3d 784, 795 (9th Cir.2002). "[N]ominal damages must be awarded *if a plaintiff proves a violation of his ... constitutional rights.*" *Estate of Macias v. Ihde,* 219 F.3d 1018, 1028 (9th Cir.2000) (emphasis added). Because plaintiffs did not prove a violation of their constitutional rights, they are not entitled to nominal, or any other, damages.

Similarly, if no taking exists, no injunction may issue. *See Art Movers, Inc. v. Ni W., Inc.,* 3 Cal.App.4th 640, 646, 4 Cal. Rptr.2d 689 (2d Dist.1992) ("A permanent injunction is a determination on the merits that a plaintiff has prevailed on a cause of action for tort or other wrongful act against a defendant and that equitable relief is appropriate."). An injunction cannot prevent a non-injury.

### c. General Injunctive Relief

Without reference to any particular law entitling them to such relief, plaintiffs request an injunction against future VOC migration, surface water, trash, odor, and debris. The court again refers plaintiffs to *Lopez*, 2010 WL 1558938. *See id.* at \*9 ("Because an injunction is merely a remedy and is not a cause of action, a cause of action must exist before injunctive relief may be granted.").

Plaintiffs' request for an injunction against the possibility of future VOC migration is misguided. The court found that plaintiffs had not met their burden of showing that VOC migration had occurred. (Mem. of Decision at 11:27–12:2.) Similarly, no evidence was presented to demonstrate that VOC migration was likely to occur in the future. "Injunction issues to prevent existing or presently threatened injuries. One will not be granted against something merely feared as liable to occur at some indefinite time in the future." *Connecticut v. Massachusetts*, 282 U.S. 660, 674, 51 S.Ct. 286, 75 L.Ed. 602 (1931); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 101–02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) ("[T]he injury or threat of injury must be both real and immediate, not conjectural or hypothetical.") (internal quotation marks omitted). The court will not issue an injunction against the mere possibility that VOC migration will occur in the future.

Similarly, the court found that water drained through a culvert under Highway 59 from the landfill toward the Crane property, but it did not find that the water left the Caltrans right of way, that the water flooded the Crane property, or that it was likely to do so in the future. (Mem. of Decision at 15:24–16:13.) Plaintiffs did not demonstrate that surface water injured them in any way or even came onto their land.

While the court did find that plaintiffs proved that trash and odor blew from the landfill onto the Crane property and that debris from the creeks was deposited on the property (Mem. of Decision at 14:7–13, 16:23–26), the court found that no damage occurred because of the trash, odor, or debris. (*Id.* at 14:14–15:22, 16:26–17:6.) To be entitled to an injunction, plaintiffs must prove an irreparable injury, which they failed to do. *See eBay*, 547 U.S. at 391, 126 S.Ct. 1837.

Accordingly, the court will deny plaintiffs' requests for nominal damages and injunctive relief.

### 3. Declaratory Relief

Plaintiffs have failed to show entitlement to declaratory relief. Declaratory relief is only appropriate when the facts alleged "show that there is a substantial controversy ... of sufficient immediacy and reality to warrant the issuance of declaratory judgment." *Boeing Co. v. Cascade Corp.*, 207 F.3d 1177, 1192 (9th Cir.2000). Plaintiffs have provided no explanation as to what they wish the court to declare in light of the court's previous decision in defendant's favor or why such relief would be appropriate. Accordingly, the court will deny plaintiffs' motion to the extent that it seeks declaratory relief.

### B. Attorney's Fees

■ Section 1988(b) of Title 42 of the United States Code authorizes the court, in its discretion, to award a "reasonable" attorney's fee to the prevailing party in a case brought under 42 U.S.C. § 1983. A "prevailing party" is one who succeeds on any significant issue in litigation, achieving some of the benefit sought in bringing the suit, and resulting in a "material alteration of the legal relationship of the parties." *Tex. State Teachers Ass'n v. Garland In-*

*dep. Sch. Dist.,* 489 U.S. 782, 792–93, 109 S.Ct. 1486, 103 L.Ed.2d 866 (1989).

 While § 1988 makes no such distinction, courts have interpreted the statute to treat a prevailing defendant differently from a prevailing plaintiff; fees are not awarded routinely or simply because the defendant succeeded. *See Patton v. Cnty. of Kings,* 857 F.2d 1379, 1381 (9th Cir.1988). To be awarded fees, a prevailing defendant must demonstrate that the "plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith." *Christiansburg Garment Co. v. E.E.O.C.,* 434 U.S. 412, 421, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978). This standard is "stringent," *Hughes v. Rowe,* 449 U.S. 5, 14, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980), and the Ninth Circuit repeatedly has recognized that attorney's fees in civil rights cases "should only be awarded to a defendant in exceptional circumstances." *Saman v. Robbins,* 173 F.3d 1150, 1157 (9th Cir.1999) (quoting *Barry v. Fowler,* 902 F.2d 770, 773 (9th Cir.1990)) (internal quotation mark omitted); *see also Herb Hallman Chevrolet, Inc. v. Nash–Holmes,* 169 F.3d 636, 645 (9th Cir.1999); *Brooks v. Cook,* 938 F.2d 1048, 1055 (9th Cir.1991). "An action becomes frivolous when the result appears obvious or the arguments are wholly without merit." *Galen v. Cnty. of Los Angeles,* 477 F.3d 652, 666 (9th Cir.2007) (citing *Christiansburg,* 434 U.S. at 422, 98 S.Ct. 694). A court must "resist the understandable temptation to engage in *post hoc* reasoning by concluding that, because a plaintiff did not ultimately prevail, his action must have been unreasonable or without foundation." *Christiansburg,* 434 U.S. at 421–22, 98 S.Ct. 694.

Courts should be cautious when considering an award to a prevailing defendant where the lawsuit was initiated by a party with limited financial resources or one who is appearing pro se. *See Miller v. L.A.*

*Cnty. Bd. of Educ.,* 827 F.2d 617, 620 (9th Cir.1987). However, courts have expressed more willingness to award attorney's fees against "corporate-type plaintiffs who present meritless civil rights claims," because "[s]aid group of plaintiffs is certainly well equipped to finance a civil rights suit." *Goldrich, Kest & Stern v. City of San Fernando,* 617 F.Supp. 557, 564 (C.D.Cal.1985); *see Wal–Mart Stores, Inc. v. City of Turlock,* 483 F.Supp.2d 1023, 1028 (E.D.Cal.2007).

### 1. *Entitlement to Fees*

 Plaintiffs' first cause of action, for inverse condemnation, was brought under the Fifth Amendment to the United States Constitution, § 1983, and the California Constitution. (Third Am. Compl. ("TAC") ¶¶ 36–43.) Their seventh cause of action, for "Violation of Due Process Clause of the Fourteenth Amendment of the United States, and Title 42 U.S.C. § 1983," was brought under § 1983, and incorporated by reference all other allegations in the TAC. (*Id.* ¶¶ 83–91.)

As the court explained in its Memorandum of Decision:

> Plaintiffs' allegations can be separated into four distinct allegations: (1) volatile organic compounds ("VOCs") have migrated through the soil from the landfill onto Lot 1; (2) trash and odors are blown onto the Crane property from the landfill by the wind; (3) runoff water from the landfill floods Lot 1; and (4) debris from the creeks accumulates on the Crane property.

(Mem. of Decision at 4:6–12.)

Plaintiffs' allegations that VOCs from the landfill migrated onto their property were completely groundless. Plaintiffs tested for VOCs at only one location on the Crane property: the bottom of the Caltrans right of way drainage area, on Lot 1. Most of the contaminants found were petroleum-

related. (Mem. of Decision at 11:23–27.) Plaintiffs' expert himself concluded that the area of influence from which one could deduce similar results was only 50 to 100 feet. (Summ. J. Order at 11:2–28.) Plaintiffs then tested twice more without giving notice to defendant of the testing, in direct contravention of the court's orders. (Tr. of Proceedings on Def.'s Mot. for Sanctions at 7:17–8:12 (Docket No. 82).) On one occasion, plaintiffs' expert even asked if defendant should be notified of the testing, and was explicitly told by plaintiffs' counsel not to inform defendant. (*Id.* at 8:21–9:2.) At summary judgment, plaintiffs withdrew their allegations concerning groundwater contamination after it was pointed out that even their expert testified that no VOCs were found in the groundwater. (Summ. J. Order at 7:25–8:6.)

Plaintiffs knew or should have known that their allegations regarding VOCs in the soil were similarly flawed. At trial, plaintiffs' experts' opinions and their testing techniques were conclusively disproved. (*See* Mem. of Decision at 8:20–12:2.) Plaintiffs cannot have been taken by surprise by their own lack of evidence and the insurmountable deficiencies in their experts' opinions, particularly given that they were provided with initial and rebuttal expert reports by defendant's experts explaining those deficiencies in May and June of 2010. At trial, defendant's expert E. Wayne Pearce, who plaintiffs never attempted to depose despite his disclosure as an expert, testified that the tests performed by plaintiffs were "indefensible." (*Id.* at 9:11–15.) His testimony was completely unimpeached by plaintiffs.

While a court should not find a claim to be frivolous just because the evidence presented in support of that claim was discounted because of a credibility problem or a weighing of the evidence, plaintiffs' VOC evidence was not just incredible; the "evidence" had no basis in fact.

This conclusion is bolstered by several other defects in plaintiffs' case. Plaintiffs' expert Timothy Souther, while not an expert on anything health-related, testified that he looked at a chart that was not intended to be used to assess human health risk and made certain assumptions about the health risk involved. Similarly, plaintiffs' appraiser Jeffrey Lien's testimony that the property value must have depreciated to zero was based on these assumptions regarding damage and health risk, without any basis in fact.[7] Plaintiffs did not attempt to contest testimony by defendant's witnesses Ambrose McCready, who testified that the landfill met all standards of care, or Paul Damian, who testified that even assuming conditions far worse than those present on the Crane property, such as an enclosed building in which people lived, and even taking the faulty data presented by plaintiffs as true, no health risk could exist. (*See* Mem. of Decision at 13:7–13, 14 n. 7.)

Simply put, plaintiffs had no evidence that VOCs actually migrated from the landfill to the Crane property or even that VOCs existed on the Crane property. Forcing defendant to defend against sham evidence and to incur expenses presenting evidence that plaintiffs did not even attempt to rebut is the very definition of frivolity. Plaintiffs' citation to *R.P. ex rel.*

7. Plaintiffs request in their motion to amend the judgment that the court explain why it discounted Mr. Lien's testimony. While it would be inappropriate to amend the decision for that purpose, such a discussion is relevant in determining that plaintiffs' VOC allegations were frivolous. Mr. Lien was not fully certified as an appraiser and made his findings without consulting any lenders or following the Appraisal Institute ethical standards. Furthermore, it does not take an expert to speculate that, starting from the assumption that a piece of property has no value, no one will want to buy the property. The issue was not Mr. Lien's credibility so much as it was his failure to provide helpful testimony.

*C.P. v. Prescott Unified School District,* 631 F.3d 1117 (9th Cir.2011), is unavailing. That case noted that "so long as the plaintiffs present evidence that, if believed by the fact-finder, would entitle them to relief, the case is per se not frivolous." *Id.* at 1126. Surely the Ninth Circuit did not mean that a plaintiff could present completely false or nonsensical "evidence" and avoid paying attorney's fees because, *if believed,* that evidence would entitle the plaintiff to relief.

Furthermore, the evidence must be such that it would "entitle [plaintiffs] to relief," not simply support one element of a claim. *Id.* As the court explained in its decision and in discussing plaintiffs' motion to amend the judgment, plaintiffs did not demonstrate entitlement to relief on their constitutional claim, and the court cannot conceive how plaintiffs could have believed they would be entitled to relief. Because no facts supported a finding that VOCs migrated to the Crane property or that any constitutional violation occurred, there was no realistic chance of success on any constitutional claims arising from the VOC issue.

In contrast, the court found that plaintiffs proved that trash, odors, and creek debris were found on their property. However, as explained in detail regarding plaintiffs' motion to amend the judgment, plaintiffs did not even attempt to present evidence that the trash, odors, or creek debris affected them in any way. Particularly given that plaintiffs were represented and advised by highly qualified and competent counsel, the court cannot see how they could have thought they could prove a constitutional violation without any legal foundation.

Finally, as the court explained in its decision, plaintiffs presented a new theory of liability at trial by presenting the testimony of Bert Crane, Jr., that water from the landfill flooded the Crane property. No evidence was presented to support the claim, and the only pictures presented to the court showed the land in a non-flooded state. (Mem. of Decision at 15:24–16:13.) While the claim was admittedly minor and few fees would have resulted from its inclusion, there was no rational basis to believe it had any chance of success.

Because plaintiffs knew or should have known that their § 1983 claims lacked merit at the outset of litigation, defendant is entitled to recover attorney's fees under § 1988.

### 2. *Award Calculation*

To determine a reasonable attorney's fee in this case, the court must first calculate the "lodestar" amount by taking the number of hours reasonably expended on the litigation and multiplying it by a reasonable hourly rate. *Fischer v. SJB–P.D. Inc.,* 214 F.3d 1115, 1119 (9th Cir.2000) (citing *Hensley v. Eckerhart,* 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983)). There is a strong presumption that the lodestar amount is reasonable. *Fischer,* 214 F.3d at 1119 n. 4. The district court may exclude from the initial fee calculation hours that were "excessive, redundant, or otherwise unnecessary." *Hensley,* 461 U.S. at 434, 103 S.Ct. 1933. The court may then adjust the lodestar amount based on an evaluation of the factors articulated in *Kerr v. Screen Extras Guild, Inc.,* 526 F.2d 67 (9th Cir.1975), that are not subsumed under the lodestar calculation.[8] The fee applicant bears the burden

---

**8.** The factors articulated by the Ninth Circuit in *Kerr* are: (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill required to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and

of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked. *Hensley,* 461 U.S. at 437, 103 S.Ct. 1933.

Defendant proposes a lodestar figure of $345,875.00 to $432,343.80. This amount accounts for the hours expended by Roger Matzkind, James Stone, and Marianne Greene, all attorneys with the Merced County Counsel's office.

### a. *Reasonable Hourly Rate*

A reasonable rate is typically based upon the prevailing market rate in the community for "similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1211 (9th Cir. 1986); *see also Blum v. Stenson,* 465 U.S. 886, 895 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984) ("[T]he burden is on the fee applicant to produce satisfactory evidence ... that the requested rates are in line with those prevailing in the community ...."). The relevant community is generally the forum in which the court sits. *Barjon v. Dalton,* 132 F.3d 496, 500 (9th Cir.1997).

Here, defendant seeks hourly rates of $300.00 to $375.00 for Mr. Matzkind and $200.00 to $250.00 for Mr. Stone and Ms. Greene. (Matzkind Decl. ¶¶ 11–12 (Docket No. 205–1).) Mr. Matzkind represents in his declaration that these rates are reasonable hourly fees for chief attorneys and junior attorneys, respectively, in the Central Valley. Plaintiffs neither objected to the hourly rates defendant requested nor disputed the representations Mr. Matzkind made in his declaration.

Recent cases in the Fresno Division of the Eastern District of California have de-termined that hourly rates of $300.00, $315.00, and $350.00 were reasonable for "experienced and competent counsel." *Jadwin v. Cnty. of Kern,* 767 F.Supp.2d 1069, 1130 (E.D.Cal.2011). Given Mr. Matzkind's experience as an attorney practicing for more than thirty years (Matzkind Decl. ¶ 10), the court will take the average of these rates and use a rate of $325.00 for Mr. Matzkind. Mr. Stone and Ms. Greene have thirteen and twenty years of experience respectively. (Stone Decl. ¶ 2 (Docket No. 205–3); Greene Decl. ¶ 4 (Docket No. 205–6).) *Jadwin* found that a reasonable hourly rate for an attorney performing primarily research attorney services with twenty years of experience was $295.00. *Jadwin,* 767 F.Supp.2d at 1132–33. Accordingly, the court will use a rate of $250.00, the upper end of the range requested by defendant, for Mr. Stone and Ms. Greene.

### b. *Reasonable Number of Hours*

Defendant has submitted detailed billing for the work associated with this action, which totals 925.25 hours for Mr. Matzkind, 200 hours for Mr. Stone, and 143 hours for Ms. Greene. (Mem. of P. & A. in Supp. of Def.'s Mot. for Att'y Fees Exs. A, C, F (Docket No. 205).) The work in this case for which defendant requests fees was related primarily to a motion to dismiss the Third Amended Complaint, discovery issues, a summary judgment motion, and trial. After carefully reviewing the documents, and noting no objection from plaintiffs, the court finds no need to exclude any of the reported hours as "excessive, redundant, or otherwise unnecessary." *Van Gerwen v. Guarantee Mut. Life Co.,* 214 F.3d 1041, 1045 (9th Cir.

---

the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases. *Kerr,* 526 F.2d at 70. The factor regarding the contingent nature of the fee agreement has been rejected by the Supreme Court. *City of Burlington v. Dague,* 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992).

2000). Given the complexity of the case, the court finds that the hours spent were reasonable.

■ Plaintiffs argue that defendant can only recover for time spent related to the § 1983 claims and not for any state law claims. The Ninth Circuit recently held that:

> the only fees that may be awarded are those incurred for work performed exclusively in order to provide a defense against claims for which fees are permissible. If defendants do not demonstrate that the work would not have been performed in order to defend against the nonfrivolous civil rights, or to put it differently, but for the need to defend against the frivolous claims, fees associated with that work cannot be awarded, even in part.

*Harris v. Maricopa Cnty. Super. Ct.*, 631 F.3d 963, 973 (9th Cir.2011). In that case, involving several different federal civil rights claims, the district court had found that most of the civil rights claims were nonfrivolous and only a few were frivolous. The court then divided the fees on a pro rata basis, awarding a percentage of fees equivalent to the percentage of civil rights claims that were frivolous. The Ninth Circuit reversed, holding that it was inappropriate to award fees to a prevailing defendant where the fees would have been incurred to defend against the nonfrivolous federal civil rights claims whether or not frivolous civil rights claims were present. *Id.*

This is not such a case. Because there were no nonfrivolous claims here, *Harris* is inapplicable. The proper question in this case, instead, is whether fees are available for "pendant state law claims (in addition to [ ] federal civil rights claims) under [§ 1988] because these state law claims arose from a common nucleus of operative fact with a substantial federal claim." *Id.* at 976 n. 6. *Harris* explicitly stated that the issue was "an open question in our Circuit." *Id.* In *Harris*, the district court had answered the question positively, awarding fees even for the interrelated state law claims, but because the plaintiff did not challenge the district court's decision on that point, the Ninth Circuit did not reach the issue. *Id.*

Thus, this court must decide for itself whether to award fees for both the frivolous federal civil rights claims and the interrelated frivolous state law claims, when separating out the fees attributable to each would be futile. The Ninth Circuit has held that "when the *plaintiff* in a civil rights action prevails on a pendent state claim based on a common nucleus of operative fact with a substantial federal claim, fees may be awarded under § 1988." *Carreras v. City of Anaheim*, 768 F.2d 1039, 1050 (9th Cir.1985) (emphasis added). The Seventh Circuit has applied this reasoning to a prevailing *defendant* in the context of a § 1988 fee award. *Munson v. Milwaukee Bd. of Sch. Dirs.*, 969 F.2d 266 (7th Cir.1992). In *Munson*, the plaintiff brought a § 1983 claim and three pendent state law claims, which arose from the same course of conduct. *Id.* at 268. The Seventh Circuit held that when the federal and pendent state law claims are factually and legally related, and when both the federal and state claims are found to be frivolous, they should be treated as one for purposes of fee awards under § 1988. *Id.* at 272. The *Munson* court reasoned that:

> If a plaintiff can be awarded fees for work done on an *unsuccessful* pendent state claim which is factually or legally related to a successful civil rights claim, then defendants likewise should be entitled to fee awards for defending frivolous pendent claims factually or legally

related to frivolous civil rights claims. Separating out the legal services rendered for the federal and pendent claims would be futile in both circumstances.

*Id.*

While *Munson* is not binding on this court, the reasoning is persuasive. *See McAnally v. Clark Cnty.*, No. 0204CV01220, 2006 WL 240896, at *1 (D.Nev. Jan. 27, 2006) (citing *Munson* and awarding attorney's fees for § 1983 and state law claims when those claims were dismissed for the same reason and all lacked legal foundation). Here, all of plaintiffs' state law claims arose from the same set of facts as their § 1983 claims. Indeed, the court found the issues to be so intertwined that it was more effective to write the Memorandum of Decision in terms of the four distinct factual issues than in terms of each cause of action. Thus, attorney's fees may properly be awarded for the entire case because plaintiffs' frivolous § 1983 claims are inseparable from their frivolous state law claims.

The court finds that no adjustment to the lodestar figure is necessary.

Accordingly, the court will award defendant fees for the following hours: [9]

| Name | Hours | Hourly Rate | Lodestar Amt. |
|------|-------|-------------|---------------|
| Matzkind | 924.25 | $325.00 | $300,381.25 |
| Stone | 200 | $250.00 | $ 50,000.00 |
| Greene | 143 | $250.00 | $ 35,750.00 |
| TOTAL | 1267.25 | | $386,131.25 |

IT IS THEREFORE ORDERED that:

(1) Plaintiffs' motion that the trial court amend its findings or make additional findings, for new trial or to alter or amend the judgment, and for relief from judgment due to mistake or inadvertence be, and the same hereby is, DENIED;

(2) Defendant's motion to amend or clarify the findings be, and the same hereby is, DENIED;

(3) Defendant's motion for attorney's fees be, and the same hereby is, GRANTED, and fees of $386,131.25 are awarded to defendant; and

(4) Defendant's motion for Rule 11 sanctions be, and the same hereby is, DENIED.

(5) Defendant shall file a supplemental declaration detailing its fees incurred after

**9.** Defendant also moves for an award of attorney's fees under Federal Rule of Civil Procedure 11. Rule 11 gives the court authority to issue sanctions against an attorney or unrepresented party who signs a "pleading, written motion, or other paper" that is brought for any improper purpose or is not well grounded in fact, warranted by existing law, or made in good faith, and provides that sanctions for violations of the Rule may include "part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." Fed.R.Civ.P. 11(c)(4). In addition to asking for attorney's fees under Rule 11, defendant seeks costs for expert witnesses and other miscellaneous costs totaling $247,587.48. (Supplemental Mem. of P. & A. in Supp. of Def.'s Mot. for Rule 11 Sanctions Ex. A–2 at 4 (Docket No. 208).)

The court has determined an award of attorney's fees under § 1988 is appropriate and thus the court need not address attorney's fees under Rule 11. As for costs, defendant would have to show that the costs directly resulted from one of the eleven specific allegations in the Third Amended Complaint that it argues violated Rule 11, a question that would require extensive further briefing. The court will not allow the Rule 11 to prolong this litigation any further. *See Jensen Elec. Co. v. Moore, Caldwell, Rowland & Dodd, Inc.*, 873 F.2d 1327, 1330 (9th Cir.1989) ("Rule 11 can lead to costly and aimless satellite litigation having nothing to do with the dispute between the parties. Here indeed the sanctions tail is wagging the dog.") (Schroeder, J., concurring). Accordingly, the court will exercise its discretion and deny the Rule 11 motion.

the filing of the instant motions within ten days of the date of this Order.